STATE OF CALIFORNIA, United States of America, et al., Appellants,

v.

Everett G. RANK et al., Appellees.

No. 15840.

United States Court of Appeals
Ninth Circuit.

March 31, 1961.

As Corrected Aug. 14, 1961.

On Petition for Rehearing
Aug. 14, 1961.

J. Lee Rankin, Sol. Gen., William H. Veeder, Washington, D. C., Irl Davis Brett, Los Angeles, Cal., and J. O. Reavis, Delano, Cal., Stanley Mosk, Atty. Gen., of California, and B. Abbott Goldberg, Asst. Atty. Gen., of California, Denver C. Peckinpah, Fresno, Cal., Adolph Moskovitz, Sacramento, Cal., Maddox & Abercrombie, Visalia, Cal., for appellant.

John H. Lauten, Claude L. Rowe, Fresno, Cal., for appellee.

Before HAMLIN and MERRILL, Circuit Judges, and POWELL, District Judge.

MERRILL, Circuit Judge.

This case involves the Central Valley project, an important undertaking of the Bureau of Reclamation in California's Central Valley.

Suit was brought by these appellees in 1947 to enjoin Bureau officials from the

impounding of water at Friant Dam on the San Joaquin River in contravention of the rights of appellees to the beneficial use of the waters of the San Joaquin below Friant. Since commencement of this suit by individual water users, the City of Fresno has intervened as a plaintiff also asserting rights to San Joaquin waters.[1] We shall hereafter refer to appellees as plaintiffs.

By court order, in 1953, the United States, over its protest, was joined as a necessary party defendant and appears on this appeal as an appellant. In 1951, the State of California intervened and upon this appeal supports the position of the appellants. Also appearing as appellants are the irrigation districts which benefit from the operation of the Friant Dam by the Bureau. We shall hereafter refer to appellants as defendants.

This suit has finally reached this court upon the merits. The district court has granted the plaintiffs an injunction, their right to which is challenged by the defendants.[2] The issues upon appeal divide themselves into jurisdictional questions and those relating to the merits of the dispute.

The jurisdictional issues are presented by the contentions of the defendants that the United States is an indispensable party; that it has not consented to suit and has been improperly joined; that in its absence the district court was without jurisdiction to entertain the dispute with reference to the operation of the Friant Dam by the Bureau.

Upon the merits, the issue is whether it is permissible for these plaintiffs to interfere by injunction with the public use which the Central Valley project represents. More specific issues are presented by the contention of defendants that the water rights of the plaintiffs, to the extent to which they claim injury, have been taken by the United States through exercise of its power of eminent domain and that the remedy of the plaintiffs is to seek compensation in the Court of Claims.

## I. The Facts, the Pleadings and the Decree.

California's Central Valley is an immense elongated bowl approximately four hundred miles in length and at its widest point approximately one hundred miles in width. It is bounded on the north by the Siskiyou Mountains, on the south by the Tehachapi Range, on the east by the Sierra Nevada and on the west by the Coast Range. It includes more than one-third of the State of California.

The northern half of this valley is known as the Sacramento Valley and is the valley of the Sacramento River. This river rises at Mount Shasta and flows south parallel to the Sierra, joining on its course the many great rivers rising in the northern portion of the Sierra.

The southern half of the Central Valley is known as the San Joaquin Valley and is the valley of the San Joaquin River. This river rises in the High Sierra south of Yosemite Valley. Its course at first is to the west. It emerges from the mountains at a point known

1. Also intervening as plaintiff was the Tranquility Irrigation District. This court is now advised that the dispute between this irrigation district and the Bureau of Reclamation has been resolved by agreement and no longer constitutes an issue upon appeal.

2. The opinion of the district court is to be found under the title of Rank v. (Krug) United States, D.C.1956, 142 F. Supp. 1. Connected cases dealing with intermediate orders of the district court are: Rank v. Krug, D.C.1950, 90 F. Supp. 773; United States v. United

States District Court, 9 Cir., 1953, 206 F.2d 303; State of California v. United States District Court, 9 Cir., 1954, 213 F. 2d 818; Rank v. United States, D.C.1954, 16 F.R.D. 310; City of Fresno v. Edmonston, D.C.1955, 131 F.Supp. 421. Also involving the Central Valley Project but not these litigants or their disputes are United States v. Gerlach Live Stock Company, 1950, 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231, affirming the decision of the Court of Claims, 1948, 76 F.Supp. 87, 111 Ct.Cl. 1; Ivanhoe Irrigation District v. McCracken, 1958, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

as Friant, flows out on the floor of the valley and at a point known as Mendota changes to a northerly course. For the purpose of this opinion, we shall divide the San Joaquin into three segments: that to the east of Friant we shall call the "upper"; that between Friant and Mendota the "central"; that below Mendota the "lower."

These two great rivers, the Sacramento and the San Joaquin, flow toward each other to join near Stockton. In past centuries their combined flow escaped the valley through a cut in the Coast Range at Carquinez to empty into San Francisco Bay. Today the bay has invaded the valley and a substantial arm, Suisun Bay, lies to the east of Carquinez. It is into Suisun Bay, well within the Central Valley, that the Sacramento and San Joaquin now empty.

The Sacramento River, through its tremendous tributaries from the Sierra, develops a surplus of water. The San Joaquin, on the other hand, fails to produce sufficient water to enable the rich lands of its valley to realize their fertile potentialities. The Central Valley project attacks this problem. Originally projected by the State of California as part of the State Water Plan, it has, through congressional sanction and for lack of state funds, been undertaken by the Bureau of Reclamation. Its feasibility was reported to the President by the Secretary of the Interior on November 26, 1935, pursuant to § 4 of the Act of June 25, 1910, 36 Stat. 835, 43 U.S.C. § 413.

The project contemplates the impounding of the waters of the upper San Joaquin at Friant. To this end the United States has acquired, by assignment from the original applicants, applications to appropriate under state law over four million acre feet of water annually.

For the lands of the lower San Joaquin, the project contemplates an exchange of waters from the Sacramento River. This is to be accomplished by pumping Sacramento River water, at a point on its delta near Tracy, into a canal—the Delta-Mendota Canal—which would carry it south to Mendota, where it would be pumped into the bed of the San Joaquin through the Mendota pool. The waters impounded at Friant would be diverted north and south through canals to irrigation districts desperately in need of supplemental water.

Thus the upper San Joaquin is to continue in its natural flow until impounded at Friant. The lower San Joaquin is to be supplied with Sacramento water. The case before us involves the central San Joaquin, the sixty-mile stretch between Friant and Mendota. Plaintiffs claim rights to San Joaquin water upon this segment of the river as owners of lands either riparian to the river or overlying subterranean reservoirs fed by the river. The United States has successfully negotiated contracts with many of the water users on this stretch of the river. Plaintiffs are among those who have refused to enter into such contracts.

The water law of California, to which the Federal Reclamation Act of 1902, defers, § 8, 32 Stat. 390, 43 U.S.C. § 383,[3] has been extensively dealt with in the opinion of the district court. Rank v. (Krug) United States, 142 F. Supp. 1, 104–115, 161–165. We note that as distinguished from most western states California does with modifications recognize the common law doctrine of riparian rights. Lux v. Haggin, 69 Cal. 255, 10 P. 674. The riparian and (as to subterranean waters) the overlying landowners have the paramount right to the use of the waters of a stream system. An appropriator of water may reach only that surplus which is not re-

3. "That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws * * *."

quired by the riparian and overlying owners.

By constitutional amendment in 1928, the rights of riparian and overlying owners were limited to reasonable use and reasonable methods of diversion with no right to make wasteful use of water.[4] In its discussion of California water rights, the district court, in its opinion, states at page 162 of 142 F.Supp.:

"The California courts, confronted with the command of the 1928 Constitutional amendment that water should not be wasted, and also with the guaranties of that amendment that existing water rights be preserved to the extent of their present and prospective reasonable and beneficial uses, evolved a type of decree which for the sake of convenience is called a 'physical solution.'

"In essence, such decree is but the conditional injunctive decree of a court of equity. Such decrees in California water rights cases are characteristic examples of the preservation by equity courts of the elements and flexibility and expansiveness so that new remedies may be invented or old ones modified in order to meet the requirements of every case and to satisfy the needs of every progressive social condition."

Further, at pages 163–164, the opinion states:

"The matter of a physical solution becomes a practical problem which will vary with each case. That practical problem is best stated by the question—how can the utmost beneficial use be made of the waters of the particular stream without invading prior vested water rights? If those prior vested water rights can be preserved and satisfied by giving them the water to which they are entitled, and at the same time waste can be prevented by reasonable changes in natural physical characteristics, then, under the California decisions, the court may solve that problem by the use of its injunctive powers, conditioned upon making those physical changes. The parties seeking to make an appropriation or to take water, in derogation of prior vested rights, can be enjoined from taking water until those physical changes are made. The efforts of the courts of California in imposing conditional decrees of injunction requiring a physical solution have been to, as near as possible, satisfy the prior vested right whether riparian or overlying, and at the same time make available, for appropriation and reasonable and beneficial use elsewhere, all water in excess of that required to satisfy those prior vested rights."

This suit was commenced September 25, 1947. Originally brought in the state courts, it was, on motion of the defendants, removed to the district court under 28 U.S.C. § 1441(a). That removal was held proper. Rank v. Krug, 1950, supra, footnote 2.

The complaint of plaintiffs, in general effect, alleges that defendant officials of the Bureau of Reclamation, through the construction and operation of Friant Dam, threaten to and are impounding and diverting water of the San Joaquin in disregard of plaintiff's rights to the use of such water. The complaint, as supplemented and amended, alleges that

4. Article 14, § 3, of the California Constitution provides:
"The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses * * *."

ever since the commencement of the project in 1935 defendant officials and their predecessors had repeatedly informed and assured plaintiffs that their water rights would not be taken or disturbed; that on July 15, 1947, they were advised by an official of the Bureau that, unless they either accepted an offer by the Bureau for the "adjustment" of their water rights on terms fixed by the Bureau or filed suit for damages before October 20, 1947, their water rights would be taken without compensation.

The complaint prayed for an injunction against interference with their rights or, in the alternative, that the court decree a physical solution to provide them with water to meet their rights.

This suit at the outset was recognized by all parties as one to secure a judicial determination of the extent of the vested water rights of the plaintiffs and of the conditions under which defendants, without adversely affecting those rights, might appropriate waters of the San Joaquin. Although the rights of the plaintiffs to the full natural flow of the river were disputed, it was conceded that they were entitled to a reasonable quantity of water and to put such water to use by reasonable methods of diversion.[5]

The nature of the dispute changed subsequently when, in answering the com-

5. Defendant officials, in their answer, stated that the plan of the Central Valley Project—

"* * * requires the Bureau of Reclamation to, and it will, recognize and respect existing water rights of all riparian owners, including such of the plaintiffs, if any, as are riparian owners, on the San Joaquin river between Friant Dam and Gravelly Ford, as they exist under the laws of the State of California, and which have not heretofore been acquired or adjusted by the United States."

Further it is alleged:

"* * * that the authorized and declared plan of operation of the Central Valley Project will not deprive plaintiffs or any or either of them, or any other person, firm or entity, of their water rights as they exist under the laws of the State of California * * *."

The defendant officials in part prayed:

"4. That this Honorable Court determine that the lands found to be riparian to the said San Joaquin River shall be entitled to a reasonable quantity of water for beneficial use thereon for irrigation and domestic purposes, and that sufficient water be allowed to flow in the San Joaquin River to furnish said riparian owners with said supply of water by the use of reasonable means of diversion from the said San Joaquin River by pumps, and further determine that channelization of the said San Joaquin River be made so as to reduce the quantity of water to be discharged from Friant Dam in order to supply said riparian lands with said quantity of water.

"5. That this Honorable Court determine and adjudge that a live stream shall be maintained at all times between Friant Dam and Gravelly Ford on said San Joaquin River, which said live stream shall at no time be required to be in excess of the natural flow of the San Joaquin River if Friant Dam were not constructed and in operation, which said live stream shall be for the purpose of supplying the said quantity of water for use upon lands riparian to said San Joaquin River and to supply the underground percolating waters for lands determined to be entitled to a recharge from the San Joaquin River for said underground waters.

"6. That this Honorable Court further determine that at no time a flow of greater than five second-feet need pass the downstream boundary, of the lowest riparian owner upon said river between Friant Dam and Gravelly Ford."

The defendant irrigation districts and the State of California, as intervenor, alleged in response to the complaint:

"That pursuant to Article XIV, section 3 of the Constitution of the State, the plaintiffs cannot demand and the defendants cannot permit any wasteful or prodigal use of the water of the San Joaquin River. That the plaintiffs have no right to the whole flow of the San Joaquin River as alleged in paragraph IV of the complaint, nor do the plaintiffs have the right to any part of the flow of the river in excess of the amounts required to meet their reasonable needs for irrigation and domestic uses. That the plaintiffs have no right to insist on the uninterrupted use of their existing diversion devices and must submit to a physical solution whereby their reasonable needs and uses may be supplied; that this court has the power and duty of requiring a physical solution."

plaint in intervention of the City of Fresno, the defendants alleged:

"The United States of America through the exercise of its power of eminent domain has taken all rights to the use of water in the San Joaquin River which are required for the operation of Friant Dam and its appurtenant works, all components of the Central Valley Project; that fee simple title to all the rights to the use of water required for the operation of the Central Valley Project has at all times since that taking resided in the United States of America."

From the outset the defendants have contended that the United States is an indispensable party without which the district court cannot entertain this suit upon the merits. On September 18, 1953, an order was made joining the United States as a party defendant. Save for moving to dismiss the action against it, the United States thereafter ignored this suit in the district court and a default judgment has been entered against it.

Following trial, the district court ruled that the vested rights of the plaintiffs in no respect had been acquired by the United States through exercise of its power of eminent domain. Upon trial, three plans of physical solution had been offered: one by the plaintiffs, one by the defendants and one by the State of California as intervenor. The district court rejected the last two plans as inadequate. It approved in principle the plan submitted by the plaintiffs and adopted it in part, reserving jurisdiction to modify its decree as experience might direct.

The decree entered June 20, 1957, enjoined the defendants from "impounding, or diverting, or storing for diversion, or otherwise impeding or obstructing the full natural flow of the San Joaquin River." It was provided that this injunction should not go into effect should the United States or the defendant irrigation districts place in operation, maintain and operate the prescribed physical solution.

The solution as decreed consisted of a series of ten ponds in the natural channel of the river created by ten collapsible check dams to be so operated as to provide releases of water sufficient to flush and scour the aquifers by which river water found its way to the underground reservoirs from which the claimants of overlying rights received their water. By this means it was felt that a flow less than the full natural flow could simulate the full natural flow effectively. It was provided that a sufficient flow of water be released from Friant Dam to provide a minimum flow of five second feet over the last check dam downstream. Thus it was assured that the quantity of water released would, with a surplus of five second feet, be sufficient to meet the demands of all water users.

## II. The Jurisdictional Issues.

We proceed to the jurisdictional questions presented by this appeal. The first question is presented by the contention of the United States that it has not consented to suit and has improperly been joined as a party defendant.

If consent to suit is to be found, it must be through the provisions of the waiver of immunity statute passed by Congress in 1952, which has come to be known as the "McCarran Amendment." 66 Stat. 560, 43 U.S.C. § 666. This statute provides in part:

"Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit."

The question presented by the contention of the United States requires us to determine whether this suit can be regarded as one "for the adjudication of

rights to the use of water of a river system" within the meaning of § 666.

■ There can be little doubt as to the type of suit Congress had in mind. It was not a private dispute between certain water users as to their conflicting rights to the use of waters of a stream system; rather, it was the quasi-public proceeding which in the law of western waters is known as a "general adjudication" of a stream system: one in which the rights of all claimants on a stream system, as between themselves, are ascertained and officially stated.

With reference to this type of suit, the Senate Report upon the bill which became § 666 quoted as follows from Pacific Live Stock Co. v. Lewis, 1916, 241 U.S. 440, 447, 36 S.Ct. 637, 60 L.Ed. 1084:

> "All claimants are required to appear and prove their claims; no one can refuse without forfeiting his claim, and all have the same relation to the proceeding. It is intended to be universal and to result in a complete ascertainment of all existing rights, to the end, first, that the waters may be distributed, under public supervision, among the lawful claimants according to their respective rights without needless waste or controversy; second, that the rights of all may be evidenced by appropriate certificates and public records, always readily accessible, and may not be dependent upon the testimony of witnesses with its recognized infirmities and uncertainties; and, third, that the amount of surplus or unclaimed water, if any, may be ascertained and rendered available to intending appropriators." S.Rep. No. 755, 82d Congress, 1st Session 5 (1951).

The senate report also incorporated correspondence between Senators Magnuson and McCarran. The former was disturbed by the thought that private water disputes could, under the bill, interfere with reclamation projects in which he was interested. Senator Mc-

Carran wrote (S.Rep. No. 755, 82d Congress, 1st Session 9 (1951)):

> "You indicate that you visualize the possibility of an individual or group, having water rights on that stream, bringing suit to adjudicate their respective rights thereby preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending.

> "S.18 is not intended to be used * * * for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream."

In Miller v. Jennings, 5 Cir., 1957, 243 F.2d 157, 159, discussing the nature of the suit to which § 666 referred, the court stated:

> "The United States has not given its consent to be joined as a defendant in every suit involving water rights. It may be made a party only in suits 'for the adjudication of rights to the use of water of a river system or other source.' There can be an adjudication of rights with respect to the upper Rio Grande only in a proceeding where all persons who have rights are before the tribunal."

That opinion then quoted this court:

> "The Ninth Circuit Court of Appeals has most succinctly stated the doctrine in this manner: 'The only proper method of adjudicating the rights on a stream, whether riparian or appropriative or mixed, is to have all owners of lands on the watershed and all appropriators who use water from the streams involved in another watershed in court at the same time.' People of State of California v. United States, 9 Cir., 1956, 235 F.2d 647, 663."

The question remains whether the suit at bar was for such a general adjudication of a river system as was contemplated by Congress.

In two respects we feel that it has failed to measure up. First, all claimants have not been joined. Second, neither the relief prayed for nor the decree includes the establishment of the rights of the claimants as between themselves. The controversy thus is limited to a private one between the claimants on the one hand and the officers of the Bureau of Reclamation on the other.

The plaintiffs attempted to meet the problem of joinder by treating the suit as a class action under Rule 23, F.R.Civ. P. 28 U.S.C.A. In their amended complaint they asserted that they represented not only themselves but all others similarly situated. The district court ruled that the suit was a proper one for application of Rule 23, since "the character of the right sought to be enforced is a common right to water from a common source of supply * * *." Rank v. United States, supra at page 155 of 142 F.Supp.

It may well be that those claiming riparian and overlying rights could properly be treated as a class, since the scope of their rights and the limitations imposed upon them by the physical solution decreed are dependent upon circumstances common to all. This suit, however, involves appropriative and prescriptive rights as well as riparian and overlying rights. In its decree the district court took note of the fact that certain of the plaintiffs individually claimed appropriative or prescriptive rights. In six instances the decree adjudicated the rights of these plaintiffs not as between themselves but as against the defendants. The decree expressly purports to adjudicate the rights of all who claim through appropriation or prescription as a class represented by the parties plaintiff.

█ These plaintiffs, as claimants of appropriative or prescriptive rights, cannot, however, speak for others "similarly situated." The extent of the rights of others must depend upon the circumstances of each individual case. As pointed out in Miller v. Jennings, supra, appropriative rights cannot be established by a class action. The claimants individually must be before the court.

With respect to the private nature of the controversy, the district court recognized that this was not a suit in which the water users sought to enforce their rights as among themselves or to have given amounts of water declared and adjudicated as their rights. Rank v. United States, supra at pages 36, 105, 155 of 142 F.Supp. Nevertheless, since the suit required a judicial determination of rights to the use of waters of the San Joaquin, since such asserted rights were of the very essence of the suit and since their determination constituted the basic problem, the court ruled that the suit was such a one as to fall within the provisions of § 666. Rank v. United States, supra at pages 72–73.

It may well be that a general adjudication would require no more specific adjudication as to riparian and overlying rights than that which was here entered. As to the appropriative and prescriptive rights, however, the decree only purports to establish the rights of these plaintiffs as against the defendants. No priority is established save only that the rights are prior to those claimed by the defendant officials on behalf of the United States. As between the claimants themselves, their respective priorities are not established.

█ For these reasons, the suit at bar falls short of being one for a general adjudication. It is not such a suit as is contemplated by § 666. Consent to suit has not been conferred by the United States under that statute. The district court was without jurisdiction to join the United States and the United States must be dismissed from this proceeding.

The second jurisdictional question is presented by the contentions of defendant officials that this is essentially a suit against the United States; that the United States is an indispensable party and that the district court had no jurisdiction to entertain the suit in the absence of a waiver of sovereign immunity. In this respect they rely upon Larson v.

Domestic and Foreign Commerce Corporation, 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

The suit against a government official is the traditional remedy for one aggrieved by governmental action in cases where there has been no waiver of sovereign immunity and action against the United States therefore is not available. In Ickes v. Fox, 1937, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, the Supreme Court dealt with such an action in the field of water rights and there held the United States not to be indispensable. The district court carefully considered this problem in an earlier proceeding in this litigation. Rank v. Krug, 1950, supra, footnote 2, and there held Ickes v. Fox to be controlling.

The Fox case, as does the case before us, involved a project of the Bureau of Reclamation. The plaintiffs had asserted that under reclamation laws they had acquired vested rights to the use of water from a source under the control of the Secretary; that the Secretary threatened to withhold a substantial portion of water unless the plaintiffs agreed to pay certain sums for further improvements undertaken by the Bureau. The court, 300 U.S. at page 97, 57 S.Ct. at page 417, quoted as follows from Philadelphia Company v. Stimson, 1912, 223 U.S. 605, 619, 32 S.Ct. 340, 56 L.Ed. 570:

> "If the conduct of the defendant constitutes an unwarrantable interference with property of the complainant, its resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. * * * And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process."

The court, in Fox, emphasized that the water rights of the plaintiffs had become vested and that the suit had been brought "to enjoin the Secretary of the Interior from enforcing an order the wrongful effect of which will be to deprive respondents of vested property rights * * *." 300 U.S. at page 96, 57 S.Ct. at page 417. It held that under Stimson and other decisions of the court the suit was not one against the United States.

The nature of Larson v. Domestic and Foreign Commerce Corporation, supra, was, in that case, briefly stated by the court as follows, 337 U.S. at page 684, 69 S.Ct. at page 1458:

> "The complaint alleged that the Administration had sold certain surplus coal to the plaintiff; that the Administrator refused to deliver the coal but, on the contrary, had entered into a new contract to sell it to others. The prayer was for an injunction prohibiting the Administrator from selling or delivering the coal to anyone other than the plaintiff and for a declaration that the sale to the plaintiff was valid and the sale to the second purchaser invalid."

The problem presented is stated at pages 687–688 of 337 U.S., at page 1460 of 69 S.Ct. as follows:

> "* * * the crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign. * * * The question becomes difficult and the area of controversy is entered when the suit is not one for damages but for specific relief: i. e., the recovery of specific property or monies * * * or restraining the defendant officer's actions. In each such case the question is directly posed as to whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign."

In dealing with this problem, the court stated at pages 689–690 of 337 U.S., at page 161 of 69 S.Ct.:

> "* * * where the officer's powers are limited by statute, his ac-

tions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. *His actions are ultra vires his authority and therefore may be made the object of specific relief.* It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient. And, since the jurisdiction of the court to hear the case may depend, as we have recently recognized, upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies."

The court announced the rule at pages 701–702 of 337 U.S., at page 1467 of 69 S.Ct.:

"* * * the action of an officer of the sovereign (be it holding, taking or otherwise legally affecting the plaintiff's property) can be regarded as so 'illegal' as to permit a suit for a specific relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void."

The court applied the rule to the facts, at page 703 of 337 U.S., at page 1468 of 69 S.Ct. as follows:

"The very basis of the respondent's action is that the Administrator was an officer of the Government, validly appointed to administer its sales program and therefore authorized to enter, through his subordinates, into a binding contract concerning the sale of the Government's coal. There is no allegation of any statutory limitation on his powers as a sales agent. In the absence of such a limitation he, like any other sales agent, had the power and the duty to construe such contracts and to refuse delivery in cases in which he believed that the contract terms had not been complied with. *His action in so doing in this case was therefore, within his authority even if, for purposes of decision here, we assume that his construction was wrong and that title to the coal had, in fact, passed to the respondent under the contract.* There is no claim that his action constituted an unconstitutional taking. It was, therefore, inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States."

There can be little doubt that the opinion in Larson has limited the effect of Ickes v. Fox (as well as the many cases of like import discussed by Mr. Justice Frankfurter in his dissenting opinion in Larson, 337 U.S. at page 705 et seq., 69 S.Ct. at page 1469). Since Larson was handed down, courts have struggled with the problem of reconciliation. See Hart and Wechsler, The Federal Courts and The Federal System, page 1169 et seq.[6]

The task of reconciliation was undertaken, among other courts, by the Court of Appeals of the District of Columbia sitting en banc in West Coast Exploration Co. v. McKay, 1954, 93 U.S.App.D.C. 307, 213 F.2d 582.

That suit was brought to compel the Secretary of the Interior to issue a pat-

---

**6.** The authors of that text, at page 1175, in discussing Larson and the earlier opinions upon which it bore, observed that:
 "* * * historically the most plainly permissible of all types of actions against government officials, federal or state, are those in which (a) the plaintiff seeks to enjoin conduct or threatened conduct which, if not officially justified, would constitute a common law tort, and (b) the relief sought can be given by simply directing the defendant to abstain from what he is doing or threatening to do."

ent to a tract of land. The plaintiff asserted that the Secretary's refusal to do so was in violation of the Gerard Act, 10 Stat. 849, and constituted a substitution of the judgment of the Secretary for the will of Congress and thus was action beyond and in want of statutory power. The court ruled at page 594 of 213 F.2d:

"Accepting the assertion for the preliminary jurisdictional purpose only, as true, the action is not one against the United States but one to compel the Secretary of the Interior, himself, to perform a clear legal duty. Therefore, the Secretary, not the United States, is the necessary party defendant * * *."

The court distinguished the Larson case in the following language, at pages 594–595:

"In brief, the action or inaction questioned in the Larson case was that of War Assets in the exercise of its authority in disposing of surplus property of the Government and in negotiating and performing contracts for such disposal. It was not charged in the complaint that War Assets had acted beyond that authority or unconstitutionally."

It construed the ruling of the Supreme Court in Larson as based upon the fact that the complaint there had "charged erroneous action on the part of War Assets *within* its authority and not conduct beyond the power of War Assets or of unconstitutional character." Page 595.

The case at bar, we feel, is distinguishable from Larson upon the same ground as was West Coast. Here, as in Fox, we are dealing with vested rights to the use of waters with which, it has been determined, these defendant officials are interfering. This dispute, so far as the project is concerned, is external rather than internal; the rights involved are wholly independent of the project. The case thus is distinguishable from those concerned with the enforcement of rights to water developed by the project and in this respect is more clearly distinguishable even than Fox itself.

As we shall discuss later, the United States is expressly authorized by statute to acquire, by the exercise of its power of eminent domain, such water rights as are felt to be necessary to accomplish the purposes of the Central Valley project. As to rights not so acquired, the duty of the Bureau and of these defendants is to respect them. The Reclamation Act, § 8, 43 U.S.C. § 383, expressly so requires. Supra, footnote 3. Certainly no authority can be found by expression or implication for the officers of the Bureau, as an alternative to acquisition of these rights, to impair their value by operating this project in disregard of them.

As we shall discuss later, the defendants contend that these rights have been acquired by the United States through exercise of its power of eminent domain. If such were the case, defendants would, in the operation of the project, have been acting within their statutory authority. Ogden River Water Users' Association v. Weber Basin Water Conservancy, 10 Cir., 238 F.2d 936. Our ruling upon this contention, infra, is that these rights have not been acquired by the United States. Such being the case, these defendants, in disregarding and impairing the vested rights of these plaintiffs, were acting beyond their statutory authority. The United States is not then an indispensable party to this proceeding.

What we have here held applies to interference with the vested rights of these plaintiffs. Upon another and special phase of this case relating to the rights of the city of Fresno, the contentions of the defendants have merit.

Fresno, as an overlying landowner, has vested rights to underground waters from a source fed by the San Joaquin. It has alleged a need for additional water for municipal purposes and that applications to appropriate water from the San Joaquin have been made pursuant to the provisions of the California Water Code. In the meantime, Fresno has requested the Bureau to deliver water to the city at such time as the city provides it-

self with the means for receiving such water at Friant. Fresno alleges that the monetary demands of these defendants for the supplying of such water are excessive. The district court so found. It ruled that Fresno was entitled to "a declaratory judgment that any charge for water which may be made by the United States should be reasonable." It specified that reasonableness required that such charge should be "no more than the Irrigation Districts [supplied by Friant] are charged from time to time for Class I water." Rank v. United States, supra at page 185 of 142 F.Supp.

█ In negotiating and contracting for the delivery of water from Friant Dam, defendant officials were acting within the scope of their statutory authority and were carrying out the duties imposed upon them by their official positions. It is their administrative function to determine the rates at which water shall be delivered. It cannot be said that their statutory authority is limited to the making of such determinations as the courts may find to be reasonable. The complaint of Fresno in this regard is a complaint against the United States and this dispute may not be entertained judicially without a waiver of sovereign immunity on the part of the United States.

Fresno protests that it has a preferred right to supplemental water under California's County of Origin and Watershed of Origin statutes. California Water Code §§ 10505, 11460–11463.[7] The district court ruled that under these statutes the United States, prior to diverting San Joaquin water beyond the watershed or county of origin, must satisfy the needs of Fresno.

We may assume, without deciding, that these statutes apply to give Fresno a preferred position over defendant dis-

---

7. Water Code § 10505:
 "No priority under this part shall be released nor assignment made of any application that will, in the judgment of the commission, deprive the county in which the water covered by the application originates of any such water necessary for the development of the county."
 Water Code § 11460:
 "In the construction and operation by the department of any project under the provisions of this part a watershed or area wherein water originates, or an area immediately adjacent thereto which can conveniently be supplied with water therefrom, shall not be deprived by the department directly or indirectly of the prior right to all of the water reasonably required to adequately supply the beneficial needs of the watershed, area, or any of the inhabitants or property owners therein."
 Water Code § 11461:
 "In no other way than by purchase or otherwise as provided in this part shall water rights of a watershed, area, or the inhabitants be impaired or curtailed by the department, but the provisions of this article shall be strictly limited to the acts and proceedings of the department, as such, and shall not apply to any persons or state agencies."
 Water Code § 11462:
 "The provisions of this article shall not be so construed as to create any new property rights other than against the department as provided in this part or to require the department to furnish to any person without adequate compensation therefor any water made available by the construction of any works by the department."
 Water Code § 11463:
 "In the construction and operation by the department of any project under the provisions of this part, no exchange of the water of any watershed or area for the water of any other watershed or area may be made by the department unless the water requirements of the watershed or area in which the exchange is made are first and at all times met and satisfied to the extent that the requirements would have been met were the exchange not made, and no right to the use of water shall be gained or lost by reason of any such exchange."
 Water Code § 11128:
 "Limitations. The limitations prescribed in Section 11460 and 11463 shall also apply to any agency of the State or Federal Government which shall undertake the construction or operation of the project, or any unit thereof, including, besides those specifically described, additional units which are consistent with and which may be constructed, maintained, and operated as a part of the project and in furtherance of the single object contemplated by this part."

tricts and over the United States as to the acquisition of appropriative rights. Fresno has, however, no vested right to command the services of the United States in receiving its waters. The terms upon which the United States is willing to act in this respect remain an administrative decision which it is within the authority of the defendant officials to make.

As to that portion of the decree of the district court relating to the terms upon which Fresno is entitled to receive water from Friant Dam, the district court must be reversed.

■ The final jurisdictional contention of the defendants is that even though the United States may not itself be an indispensable party, the Secretary of the Interior is an indispensable superior officer and that the suit must therefore have been brought in the District of Columbia where service upon the Secretary might have been had. Their position in this respect is founded upon the proposition that by the decreed physical solution the court has required affirmative action of these defendants and the expenditure of public funds; that this is a matter which concerns the Secretary and that such a decree may not be imposed upon these defendants, who are wholly without authority to comply in the absence of approval by the Secretary. Defendants thus seek to escape Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231, and Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95, which lay down the rule that a superior officer is indispensable only if the relief granted will require him to take affirmative action.

This contention misconceives the nature of the decree of physical solution. The decree does not require anyone to take action; it is simply a declaration of a means whereby those seeking to appropriate waters of a stream may do so. The position of the United States in relation to waters of the San Joaquin is not simply that of a prospective condemnor. It is also an applicant for appropriative

rights under California law. So far as this case is concerned, the decree of physical solution tells these defendants (and the Bureau) that by this means they may secure the right to divert waters of the San Joaquin (which otherwise are not available for appropriation) without the necessity for condemnation of vested rights. A right to diversion by the specified means can coexist with existing vested rights.

The decree of physical solution is not then a detriment imposed upon the Bureau. It is a grant of right to the Bureau and a detriment or limitation upon the rights of the plaintiffs to the full natural flow of the river. The judgment of the Bureau to accept the physical solution or, in the alternative, to reject it and resort to condemnation remains available.

We conclude that while the United States may not be joined as party defendant the district court has jurisdiction to entertain this suit against the defendant officials so far as concerns the vested rights of these plaintiffs; that in such respect neither the United States nor the Secretary of the Interior is an indispensable party.

III. The Issues upon the Merits.

We proceed to a consideration of the issues which this appeal presents upon the merits. These issues relate, in greater part, to the contentions of the defendants that the United States has acquired (or can by physical seizure acquire) the water rights of these plaintiffs through its power of eminent domain and that their remedy is not through injunction but through an action to recover compensation in the Court of Claims under the Tucker Act. 28 U.S.C. §§ 1346, 1491.

The first question is whether the United States can acquire these rights at all through eminent domain. For three reasons plaintiffs contend that it cannot.

First, plaintiffs contend that there is no legislative authority to acquire by eminent domain the water rights on this stretch of the San Joaquin. They assert that legislative history demonstrates

that Congress understood that no rights on this stretch of the river would be taken; that the project would deal only with such waters as the United States could secure by appropriation under state law or by purchase.

We cannot agree. The statutes expressly grant power to acquire such rights as may be required. Legislative history is consistent. Indeed, the project could not operate without impairing, to some degree, the full natural flow of the river. In Ivanhoe Irrigation District v. McCracken, supra, footnote 2, dealing with the Central Valley Project, the Supreme Court stated at page 291 of 357 U.S., at page 1183 of 78 S.Ct.:

> "If the rights held by the United States are insufficient, then it must acquire those necessary to carry on the project * * *."

The City of Fresno contends that at least as to it there is no indication of congressional intent that its water rights should be subject to condemnation and thus become subordinated to irrigation purposes; that in absence of such an indication such an intent should not be presumed.

We cannot agree. The general congressional intent is clear: that where acquisition of property is necessary to permit the project to go forward, such property should be acquired. To require a showing that Congress had a particular piece of property in mind as a condition to governmental authority to condemn that piece of property would, in a project of this magnitude, wholly defeat the general congressional intent. If it be felt that in the public interest exceptions to the general authority to condemn should be made, these exceptions should be proposed to and made by Congress and not the courts.

What we have said applies as well to plaintiffs' second contention in this respect: that the only authority to condemn is as to wasteful uses of water, such as those encountered in United States v. Gerlach Live Stock Co., supra, footnote 2. We find no justification for such a limitation upon the power of the United States to condemn.

The third contention of the plaintiffs is that California's County of Origin and Watershed of Origin statutes, supra, footnote 7 (which under § 8 of the Reclamation Act, supra, footnote 3, the United States is bound to respect), prevent diversion of waters of the San Joaquin beyond its watershed until the rights of these plaintiffs have been satisfied; that to condemn the rights of these plaintiffs for the purpose of such diversion is to disregard California law contrary to § 8.

■ Assuming, without deciding, that California law gives these plaintiffs a preference over the defendant districts and the United States as to rights to appropriate surplus waters, it does not follow that such preferred rights cannot be taken by the United States. While a state can bestow property rights on its citizens which the United States must respect, it cannot take from the United States the power to acquire those rights. Accord: Ivanhoe Irrigation District v. McCracken, 1958, supra; Federal Power Commission v. State of Oregon, 1954, 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215.

■ We conclude that the United States has the power to acquire the rights of these plaintiffs through exercise of eminent domain.

The next question is whether the United States may acquire these rights by physical seizure. Plaintiffs contend, and the district court ruled, that the only manner by which the power of eminent domain may be exercised upon the Central Valley Project is through a judicial proceeding in condemnation; that rights may not be acquired by physical seizure or inverse condemnation.

This contention is based upon language contained in § 7 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. § 421:

> "That where in carrying out the provisions of this Act it becomes necessary to acquire any rights or

property, the Secretary of the Interior is hereby authorized to acquire the same for the United States *by purchase or by condemnation under judicial process,* and to pay from the reclamation fund the sums which may be needed for that purpose * * *." (Emphasis supplied.)

The Supreme Court, however, has recognized this section as authorizing a taking by physical seizure. In United States v. Buffalo Pitts Company, 1913, 234 U.S. 228, 233, 34 S.Ct. 840, 842, 58 L.Ed. 1290, it was stated:

"Furthermore, the government was authorized by § 7 * * * under which this improvement was being made, to acquire any property necessary for the purpose, and, if need be, to appropriate it."

Furthermore, in legislation specifically dealing with the Central Valley Project, Congress has used different and less restrictive language. The project was authorized and established under the provisions of the Emergency Relief Appropriation Act of 1935, 49 Stat. 115, and the First Deficiency Appropriation Act, 1936, 49 Stat. 1622. By the Rivers and Harbors Act of 1937, 50 Stat. 850, the project was expressly reauthorized. There it is provided that the Secretary *"may acquire by proceedings in eminent domain, or otherwise,* all lands, rights-of-way, water rights, and other property necessary for said purposes * * *." (Emphasis supplied.)

 In our view, it cannot be said that Congress intended with respect to the Central Valley Project that exercise of the power of eminent domain was to be exclusively through judicial proceedings and that physical seizure and inverse condemnation were not to be available.

Our views are reinforced by the result in Gerlach Live Stock Company v. United States, Court of Claims, 1948, affirmed in United States v. Gerlach Live Stock Company, supra, footnote 2. It was recognized in that case that certain riparian rights on the lower San Joaquin had been acquired by the United States through seizure and it was held that the plaintiffs were entitled to compensation therefor. Further, in Ivanhoe Irrigation District v. McCracken, supra, 357 U.S. at page 291, 78 S.Ct. at page 1183, the Supreme Court recognized the power of the United States to acquire rights, paying compensation therefor, "either through condemnation or, if already taken, through action of the owners in the courts."

We conclude that the District Court was in error in ruling that the only means, other than purchase, by which the United States may acquire title to water rights for the Central Valley Project is through judicial proceedings in condemnation.

Our rulings thus far have, we feel, reached the heart of this dispute. The United States, we have determined, has power to acquire the water rights in question and may do so by physical seizure. It may thus, by seizure, impose upon these plaintiffs the very restrictions and adjustments as to amounts and flows and methods of diversion that it sought to secure by contract, leaving the matter of compensation, in continued absence of agreement, to be fixed in the Court of Claims.

This does not dispose of the appeal, however. The defendants contend that the rights of the plaintiffs have already been seized. This contention requires consideration of the manner in which water rights may be taken by physical seizure.

Defendants first contend that plaintiffs' rights were seized in their entirety on October 20, 1941, upon which date the impounding of water at Friant Dam commenced. For this contention they rely heavily upon Gerlach, supra, as establishing the law with respect to this project. The Court of Claims there held, 1948, 76 F.Supp. 87, 98, 111 Ct.Cl. 1, 87, that taking by the United States of the rights there in question occurred not later than the specified date. Defendants insist that by that holding, af-

firmed by the Supreme Court, it has been established that on October 20, 1941, the rights of these plaintiffs were in their entirety seized by the United States through the action of the defendants in commencing the impounding of water at Friant.

The rights in dispute in Gerlach were rights riparian to what was designated as "uncontrolled grasslands"—lands which were not irrigated but which secured their river water only through the uncontrolled flooding of the river at high stages. With reference to the time of the taking of these rights, the Court of. Claims stated, 111 Ct.Cl. at page 86, 76 F.Supp. at page 97, supra:

"That time, it would seem, comes whenever the defendant's intent to take has been definitely asserted and it begins to carry out that intent. So long as it is conjectural whether or not defendant will actually take plaintiff's property, a taking has not occurred, but when conjecture ripens into a definitely asserted purpose and steps are taken to carry out that purpose, the taking may be said to have occurred.

"In the case at bar there can be no doubt that the defendant intended to deprive plaintiffs of whatever water rights they had in their lands."

This is not the case with the rights of these plaintiffs. In Gerlach there

could be no doubt but that flood waters would be captured at Friant in their entirety. There could be no dispute but that once impounding commenced the rights of uncontrolled grasslands to enjoy flood waters had been wholly taken. The enjoyment of these rights was completely inconsistent with project purposes from the very outset.

In the case before us, the operation of the dam is wholly consistent with a continuing recognition of the rights of these plaintiffs to make reasonable use of the waters of the San Joaquin. The pleadings of these defendants, as we have heretofore quoted them, footnote 5, state that the Central Valley Project, as it is contemplated, will not deprive the plaintiffs of a reasonable use of water. These defendants prayed a decree determining that the riparian lands of the plaintiffs are entitled to receive water. Further, they prayed for a physical solution which would respect the continuing enjoyment of these rights.[8]

The defendants assert that legislative history and reports to Congress respecting the purpose and nature of the project demonstrate an intent that all water of the San Joaquin flowing at Friant would be impounded and diverted. They point to language in the feasibility report (set forth as a supplement to Rank v. Krug, D.C.S.D.Cal.1950, 90 F.Supp. 773, 824) to the effect that the project would permit *"the entire flow* of the San

---

8. The district court was undoubtedly disturbed by apparent inconsistencies in the position taken by the Secretary from time to time as this litigation progressed. On March 30, 1953, in response to a request from the district judge that the Secretary clarify his position, a letter was written by the Secretary to the Attorney General .expressing his "administrative intent with respect to the operation of the Central Valley project insofar as it relates to the Friant-to-Gravelly Ford reach of the San Joaquin River." Here again it is specified that:

" * * * the Department will release from Friant Reservoir into the bed of the river a sufficient quantity of water (1) to meet all valid legal requirements for the reasonable and beneficial use of water,

both surface and underground, by reasonable methods of diversion and reasonable methods of use in that area, and (2) to provide, in addition thereto, a continuous live stream flowing at a rate of not less than five cubic feet per second at specified control points throughout the Friant-to-Gravelly Ford area, the last one to be at a point approximately one-half mile below the head of the Gravelly Ford Canal."

Later, however, it is stated by the Secretary:

"I want to emphasize that the foregoing plan of operation of Friant Dam and Reservoir is an administrative one, voluntarily assumed and voluntarily to be executed."

Joaquin River to be regulated in Friant Reservoir * * * and to be utilized in the southern San Joaquin Valley * *." (Emphasis supplied.) They point to Finding No. 35 of the Court of Claims in the Gerlach case:

"Defendant's plan, as modified, contemplated that the United States should eventually store and divert to non-riparian use all the waters of the San Joaquin River flowing at Friant, except for occasional spills."

They point to language of the Supreme Court in Gerlach, 339 U.S. at page 729, 70 S.Ct. at page 957:

"A cost of refreshing this great expanse of semi-arid land [that supplied with project water by the United States from Friant] is that, except for occasional spills, only a dry riverbed will cross the plain below the dam."

The fact is, however, that the river below Friant will not be dried up. The United States is under a contractual obligation to numerous landowners to maintain a live stream. The United States has not then by the construction of the dam and the impounding of waters seized in their entirety the rights of these plaintiffs.

Appellants next contend that the rights of these plaintiffs have been taken by the manner in which the dam has been operated. This taking, they assert, was a partial taking: a taking to the extent that injury has been sustained.

While the river will not be dried up below Friant, there is no doubt but that the project from the outset contemplated that the full natural flow would no longer pass Friant. There is no question but that the manner in which the dam has been operated by the Bureau has not permitted such flow. By operation of the dam, then, defendants may, indeed, have seized the physical corpus of waters which plaintiffs have a right to put to use. The question is whether such a taking, assuming it have occurred, constitutes a seizure of the water rights of these plaintiffs or, on the other hand, constitutes mere trespass upon them.

The peculiar characteristics of a water right as property are such as to demonstrate that seizure of such a right requires something more of a condemnor than would be necessary in the seizure of other types of property. This case is thus distinguishable from United States v. Dow, 1958, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109, and Hurley v. Kincaid, 1932, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637.

▆▆▆ Plaintiffs' rights give them no title to the corpus of the water. The rights are usufructuary; they are rights to the use of water only. An isolated instance in which a certain amount of water has been taken would, of course, constitute a taking of the right to the use of that water by another. However, it would not necessarily constitute any attack upon that person's right to a continuing flow in a specified amount and to put water in a specified amount to beneficial use in the future. By virtue of the peculiar nature of the water right as property, a seizure of such right has important prospective as well as retrospective aspects. It does not relate solely to what has been taken in the past or is being taken in the present. It relates as well to the right to receive in the future. A condemnor cannot seize by saying only: "I hereby take X gallons of water." To effect a seizure of water rights, he must by word or action unequivocally say: "I hereby take your right to receive X gallons in the future." [9]

To illustrate the equivocal character of a taking of water, standing alone, we may suppose a case in which A has a right to 100 inches and the government

9. "The damages claimed for diversion of a natural stream must be for the injury to plaintiff's enterprise consequent to the loss of the flow and the use of the water, not for the value of the water at so much per inch or gallon, since plaintiff does not own the corpus of the water, but a usufruct." 1 Wiel, Water Rights in the Western States (3d Ed.), 1912 at page 699.

during the month of August so regulates the flow of the source that A received only 90 inches, the balance being diverted by the government to its own use. What was the situation when this taking commenced? (1) Had A's right been seized in its entirety; or (2) had it been seized to the extent of 10 inches with the result that thereafter A had a right to receive only 90 inches; or (3) had it been seized to the extent of 10 inches in August, reverting to 100 inches in September?

If one's sole remedy for such a "taking" is to be an action for compensation in the Court of Claims, he must know what of his right has been taken: as to amounts, as to flows, as to methods of diversion. And he must have this knowledge not after the fact but at the time the interference occurs. Otherwise, the interference is more consistent with a transitory trespass upon his water rights than with a physical seizure of them. If, in the hypothetical case, the government on August 1 had no plan other than to take, day by day, whatever it felt was necessary, there would have been no seizure of water rights. There would, it is true, have been a taking of property as to which A had the right of use. There would have been compensable damage as to such taking. The water right would remain, however. While an isolated instance of a taking of water would not reflect upon a user's water right, still the taking can progress to a point where the right becomes clouded by apparent challenge. A casual day by day taking under these circumstances constitutes day to day trespass upon the water right.

That there is a remedy in damages for such interference after the fact of the interference is not sufficient. The cloud cast prospectively on the water right by the assertion of a power to take creates a present injury above what has been suffered by the interference itself—a present loss in property value which cannot be compensated until it can be measured. Whether this trespass sounds in tort or is, as to the compensable injury, an actual taking of property is, we feel, an academic question not material to this case. In either event, the act is prospective impairment of the water right for which there is no remedy by compensation.

■ In an exercise of its power of eminent domain, then, the United States must commit itself as to what is taken and as to what remains untaken. That which remains untaken and continues vested in the owner, the officers of the United States must continue to respect.

In the case at bar, the operation of Friant Dam was not of such a character as to notify these plaintiffs as to the extent of the seizure of their rights. Nor was it accompanied by any sufficiently definite uttered or written notification.[10]

■ We conclude that the water rights of these plaintiffs have not been acquired by the United States through exercise of its power of eminent domain.

■ Our ruling in this respect and the reasons stated therefor dispose as well of defendants' contention that certain of these plaintiffs have waived their rights to injunction and to deny a seizure of their water rights by having already

10. Defendants assert that plaintiffs had ample notice through the manner in which Friant Dam was operated after July 1, 1953. Prior to that date the operation of the dam had been controlled by court order requiring release of at least 400 cubic feet per second. Upon lifting of this order, the flow was cut. The record shows a flow of 170 cubic feet per second in June, 1954; of 125 in September, 1954; of 145 in June, 1955; of 133 in September, 1955. Defendants assert that this manner of operation together with the statement of administrative intent contained in the Secretary's letter of March 30, 1953, to the Attorney General (see footnote 8), was sufficient to notify plaintiffs as to what portion of their rights was being taken.

We cannot agree. Without more specific commitment on the part of the Secretary, we cannot see how these plaintiffs could possibly anticipate what would occur next.

filed actions under the Tucker Act to recover for damages already incurred. The contention that they have incurred compensable injury from acts of the defendants is not inconsistent with a contention that their water rights have not been seized and must be respected.

Finally, defendants contend that, apart from all questions of eminent domain, it should not be available to these plaintiffs to interfere by injunction with the public use which the Central Valley Project represents. They protest in effect: "A claim for damages we can meet, but we cannot live with an injunction." They quote from the Supreme Court in Larson, supra, 337 U.S. at page 704, 69 S.Ct. at page 1468, as follows:

"* * * it is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government. It is a far different matter to permit a court to exercise its compulsive powers to restrain the Government from acting, or to compel it to act. There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right."

■■■ . The question is as to the extent of freedom which the Bureau should enjoy in operating Friant Dam for project purposes. We are concerned here with a balancing of the public interest which this project represents and the private interests represented by these plaintiffs. We cannot say that the district court was in error in determining the balance to fall in favor of the plaintiffs.

Others have, in operations of this sort, lived successfully with such an injunction as this. The compulsion to respect vested rights has not been felt to halt such projects in their tracks. If defendants are right in their contentions, then Friant Dam can be operated without regard to the rights of those downstream (save the right to compensation after the fact of injury) and at the whim and caprice of Bureau officials giving full consideration only to those to whom they sell project water. Any respect accorded to the rights or needs of those downstream would, as the Secretary stated in his letter to the Attorney General, supra, footnote 8, be voluntarily assumed and voluntarily executed.

The question is whether these plaintiffs should be required to live with such free governmental control. A water right with no assurance of its peaceful enjoyment is worth little to a farmer whose very existence is dependent upon the predictability of his future water supply. For this reason, the injunction is one of the traditional forms taken for the judicial establishment of water rights.

Defendants protest that for the district court to impose upon them the court's physical solution is for the court to substitute its judgment for that of the Bureau contrary to congressional intent in establishing the project. They assert that we should not tolerate such judicial intrusion into this specialized executive area.

We have already pointed out that defendants misconceive the nature of the physical solution. Their right to substitute their own solution and proceed in accordance with their own plans is still available to them provided the necessities for acquisition by eminent domain are met as to this now judicially established right.

To summarize: These plaintiffs are not attempting, through the device of an action against these officials, to get back from the United States something that has been taken from them or to compel the United States to do something for their benefit or (as in Hurley v. Kincaid, 1931, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637) to enjoin the United States from exercising its power of eminent domain. The decree simply tells these officials that until the rights of the plaintiffs *have*

been acquired by the United States, it is the statutory duty of these officials in the operation of Friant Dam to respect those rights.

Defendants protest that even though an injunction be proper, there is no occasion to require the full natural flow of the river; that their operations of Friant Dam demonstrate that the riparian owners can comfortably get along on less. This may be so as to the riparian owners: There is evidence, however, that Fresno's rights cannot be met save by the full natural flow or an adequate simulation of such flow.

We conclude that the district court should not be reversed as to the injunctive aspect of its decree.

## IV. Decision.

Save in the respects here specified, the judgment of the district court is affirmed. As to the joinder of the United States the district court is reversed. As to the rights of the City of Fresno, the district court is reversed in the respect specified in our opinion. This matter is remanded with instructions that the United States be dismissed as defendant and that the decree of the district court be vacated and set aside insofar as it relates to the terms upon which the City of Fresno is entitled to receive water from the United States at Friant Dam. Each party will bear its respective costs incurred on this appeal.

## Upon Petition for Rehearing.

The City of Fresno has petitioned this court for rehearing. By order entered this day rehearing has been denied. In two respects, however, we feel that an opinion may serve a clarifying purpose.

## I.

Fresno asks that this court require the trial court to bring in as additional parties those holders of prescriptive or appropriative rights not now joined and points out in support that in excess of one million dollars has already been expended in the trial of the present action.

It is not clear to us what purpose would be accomplished by such joinder. It would not, standing alone, as we discussed in our opinion, convert this action into a general adjudication of a stream system. We decline to enter such an order.

We do appreciate the fact that much time, effort and cost have been expended on this litigation and that the disputes have expanded far beyond the original issues. It is quite possible that further useful ends can be served by this proceeding from time to time in the adjudication of specific rights or otherwise. If so, the continuing jurisdiction of the district court may provide a forum for consideration of such new matter and it is not our present purpose anticipatorily to limit the jurisdiction of the district court in any such respect. So far as concerns the issues of this appeal, however, we find no occasion to delay our judgment pending any further district court consideration.

## II.

Fresno has again, and vigorously, presented its contention that California's county and watershed of origin statutes are, under § 8 of the Reclamation Act, 43 U.S.C.A. § 383, binding upon the United States and preclude the diversion by these defendants of water of which Fresno has present need.

It would appear either that we do not understand what it is that Fresno seeks in this respect or that Fresno does not appreciate the distinction we draw between vested rights to natural flow and rights to project water: Hence the following elaboration upon our opinion.

It may well be that Fresno, under California law, has preferred rights to additional natural flow. If and when such rights have been established in accordance with state law, Fresno may be able effectively to protest the impounding of waters by these defendants in contravention of such rights. But this is speculation upon future events and future issues and decision must await the occurrence and the dispute.

The judgment of the district court, which we reversed in this respect and to which Fresno's petition for rehearing is directed, did not appear to relate to Fresno's right to natural flow, however. It appeared to relate to Fresno's right to project water. If Fresno is to have such water or is to enjoy the benefits of Friant storage or the delivery service of the United States, the terms upon which it may do so are not (for the reasons expressed in our opinion) appropriate issues in this action against the individual officers of the bureau.