Strafford,
No. 5207.

SEACOAST WATER COMMISSION *& a.*

*v.*

PORTSMOUTH *& a.*

Argued April 7, 1964.
Decided October 6, 1964.

*Burns, Bryant & Hinchey* and *E. Paul Kelly* (*Mr. Kelly* orally), for the plaintiffs.

*Louis M. Janelle,* U. S. Attorney and *Roger P. Marquis* [of the District of Columbia], Attorney, Department of Justice (*Mr. Janelle* and *Mr. Marquis* orally), for the United States of America.

*John C. Driscoll,* city solicitor, *Fuller, Flynn & Powell,* and

*Boynton, Waldron & Dill (Mr. Driscoll* and *Mr. Wyman P. Boynton* orally), for the city of Portsmouth.

WHEELER, J. Petition for adjudication of rights to use water, for declaratory judgment, and for injunction filed May 15, 1962 by the Seacoast Water Commission, city of Dover, city of Somersworth, town of Madbury and town of Durham, all municipal corporations in this state and located in the county of Strafford, seeking to restrain the defendant United States of America from conveying under contract the Bellamy River dam to the defendant city of Portsmouth for its exclusive use, and a determination of the rights and interests of the various parties in and to the water supply in Strafford county, particularly the Bellamy River dam.

The case was removed to the U. S. District Court on May 21, 1962 and subsequently remanded to Strafford County Superior Court on December 19, 1962 for lack of jurisdiction. See *In re Green River Drainage Area,* 147 F. Supp. 127, 134 (D. Utah 1956). On January 20, 1963, following remand, the defendants United States of America and the city of Portsmouth filed special pleas and motions to dismiss. The motion of the United States was upon the grounds that the United States has neither consented to be sued nor waived its immunity from suit under the facts and circumstances presented by the petition and that 43 U.S.C., *s.* 666 is "not susceptible of a construction that Congress has thereby consented to suit against the United States exclusively in state courts." The same motion further alleged that granting of the relief sought by the plaintiffs would constitute substitution of the will of the court for that of the governmental agencies charged by law with the conduct of all affairs concerning military installations; and that the petition sets forth no ground for relief. The city of Portsmouth alleged in its motion that the petition is in essence a suit against the United States of America which has not waived its sovereign immunity; that to grant all or any part of the relief prayed for by the plaintiffs would be unconstitutional as being violative of the principle of the separation of powers between legislative, executive and judiciary, and that the petition under no circumstances can be construed to set forth any cause of action upon which any court could grant relief.

The Seacoast Water Commission, with a principal place of

business at Durham, was constituted by act of the Legislature. Laws 1957, c. 364. It consists of the chairman of the Water Resources Board and one representative from each city, town and water district in the seacoast area, and one representative from the University of New Hampshire, appointed by the Governor with the advice and consent of the Council, for the purpose and with the power and rights to represent the interests of the cities, towns and water districts in the seacoast area and the University of New Hampshire in connection with any future metropolitan area and inter-municipal water supplies and systems.

The petition alleges that this action is brought as a class action on behalf of the plaintiffs individually and as members of the Seacoast Water Commission as well as on behalf of the cities, towns and water districts in the seacoast area and of the University of New Hampshire as members of the Seacoast Water Commission and/or as beneficiaries or parties in interest therein and that the rights which are the subject of this action are common to all parties.

In September 1951, the 82d Congress authorized the Department of the Air Force to construct and establish a military air force base in Portsmouth which is now known as the Pease Air Force Base. The area selected for the base comprised the northwesterly part of Portsmouth, northeasterly part of Greenland and the southern portion of Newington.

Located within the central portion of this area was the Portsmouth municipal airport as well as established water rights of the city which included the right to pump and remove subterranean waters, in an area to the west in which there were two impounding reservoirs. These had been developed to furnish the city with its main source of water supply for both domestic and industrial purposes.

In order to prevent condemnation proceedings by the Government, the city of Portsmouth on January 27, 1954 entered into a contract which in substance provided that the city would convey all its rights and lands within the air base area and permit the Government to commence immediate construction of the base under certain provisions with respect to the water resources, in consideration of the conveyance to the city of a replacement water supply to be constructed by the Government, of equivalent quantity and quality with sufficient additional supply to provide for the air base requirements. The contract contained an esti-

mate of the capacity of the city's four water sources to be four hundred twenty million gallons per year or one million, one hundred and fifty thousand gallons per day. This estimate was not · concurred in by the city, and the subsequent operation of the water system produced a revised estimate of the four sources of supply to be two million, one hundred and seventy thousand gallons per day. This estimate was incorporated in an amendment to the original contract dated August 3, 1960 which increased by 1,000,000 gallons per day the amount to be furnished as provided in the original contract.

Pursuant to its agreement under the contract, the Government undertook a replacement development by drilling wells and appurtenances in the Johnson's Creek area in Madbury. These wells which were turned over to Portsmouth on completion, after continuous pumping operations, ran dry in a few months indicating a safe maximum yield of about 600,000 gallons per day, which was clearly insufficient to satisfy the replacement agreed upon and the additional quantity required by the air base, and was not acceptable to Portsmouth.

In a supplemental agreement dated August 1, 1961, Portsmouth and the Government mutually agreed that the Johnson Creek development in Madbury and Dover had been found deficient in supplying the required quantity of water and that the Madbury wells together with a dam and reservoir to be built on the Bellamy River in Madbury would be an acceptable means of providing a substitute water supply.

It was further stipulated there be added to Article I of the contract under "Obligations of the Owner" the following new paragraph: "g. The Owner [Portsmouth] will regulate the flow of water through the dam in such a manner that the combined flow through the outlet together with any uncontrolled flow over the spillway shall be sufficient for downstream riparian owners and such others as may legally be entitled to water and related rights in the Bellamy River downstream of the dam."

Article 6 of the original "Service Contract" was deleted and the following paragraph substituted: "Article 6. The Owner agrees to enter into Modification No. 2 of Contract No. DA-19-016-ENG-2987 with the Government, simultaneously with the execution of this agreement, whereby the Government will have the right to purchase water from the Owner at rates specified therein."

In the meantime other sources of supply to comply with the original contract had been sought by the Government and in January, 1958, certain test borings were made in the Pudding Hill section, so-called, preparatory to constructing a series of wells to be connected with the Johnson Creek area wells for the purpose of fulfilling the obligation of the Government under its contract.

In February, 1958, the Government was notified by Dover that it objected to the construction of the wells in the Pudding Hill area on the ground that irreparable loss would be caused to Dover by diverting and depriving it of water to which it had superior and paramount rights, and that the Government would be held responsible for any resulting damage if construction was continued. In March, 1958, Dover instituted legal proceedings against the Government to enjoin it from acquiring by eminent domain proceedings or otherwise any interest or title to any land or water rights in the Dover-Madbury area for the purpose of providing a new water supply for Portsmouth under the contract dated January 27, 1954, and further requested the Court to order the Government to construct the proposed Bellamy River dam and reservoir in Madbury. While this petition was pending in the United States District Court, having been removed there from the Strafford County Superior Court, and before any decision thereon, the Government, on April 21, 1958, instituted condemnation proceedings to condemn 10.47 acres of land in the Pudding Hill area of Madbury for the purpose of constructing wells to be connected with the Johnson Creek wells. See *United States* v. *10.47 Acres of Land*, 218 F. Supp. 730 (D. N.H. 1962). On July 11, 1958, the District Court granted the Government's motion to dismiss the proceedings of the city of Dover. The court stated in part: "Thus a primary issue in the instant cases, and a likely issue insofar as it affects the plaintiff in the condemnation case, is whether or not the United States may condemn property of a private party for the purpose of conveying it to another private party to compensate it for property taken for public use. . . . Also at issue in these cases and in all probability in the condemnation proceedings is whether the eminent domain action is authorized by Congress." *Durham* v. *U. S.*, 167 F. Supp. 436, 438. See also, *Dover Sand & Gravel, Inc.* v. *Jones*, 227 F. Supp. 88 (D. N.H. 1963).

The construction of Bellamy River dam and reservoir was

originally authorized by the 85th Congress in August 1957, the availability of the necessary funds being contingent on the withdrawal of any pending suit in connection with the development of the Pease Air Force Base water supply.

In 1959 the Government filed in U. S. District Court condemnation proceedings to acquire some 800 acres of land in fee simple in Madbury "for public use to adequately provide for the establishment of additional facilities for the use of the Department of the Air Force, and for other military uses incident thereto in connection with Pease Air Force Base, and for such other uses as may be authorized by Congress or by executive order."

The petition before us alleges that on December 11, 1958, the city of Dover "having confidence in and reliance upon Congress and the United States that upon withdrawal of the suit now pending instituted by Dover . . . in connection with the development of the Pease Air Force Base water supply, funds for the construction of the Bellamy River dam and reservoir being made available and that construction of said dam will be immediately commenced, dismissed said action."

In 1959, the United States began construction of the Bellamy River dam, so-called, impounding the Bellamy River in Madbury. The safe yield of the watershed and reservoir was estimated by the Corps of Engineers at 5.7 million gallons per day. The estimated final completion costs of the dam and reservoir, together with the treatment plant, is in excess of four million dollars. The operation and maintenance expenses at the plant would be approximately $88,000 per year.

On October 3, 1959, the Water Resources Board entered into a contract with consulting engineers to make an engineering investigation for a metropolitan water supply for the seacoast area. On October 14, 1960, a report was submitted which in substance stated that there was an increasing need for additional water supply facilities in the seacoast area because of a large increase in population during the past twenty years. It advised that the existing Bellamy supply and treatment plant would form the core of a metropolitan water supply since it is the approximate center of the population area. It recommended that the proposed metropolitan supply be administered by the State of New Hampshire through the Water Resources Board and that further steps be taken to increase the capacity of the Bellamy dam by diverting water from other available sources in the

vicinity to the end that an available supply to serve the proposed metropolitan area be increased to twenty million gallons per day.

By deeds dated October 11, 1962, and recorded in Strafford and Rockingham county registry of deeds on August 20, 1963, the United States of America conveyed to the city of Portsmouth "in consideration of the acquisition by the grantor from the city of Portsmouth of all its real estate rights, title and interest comprising all its real estate including the portion of its present water supply system within the Air Force Base" all its right, title and interest in the Bellamy dam and reservoir, together with all appurtenances as well as other lands in Rockingham county.

The plaintiffs allege that the city of Portsmouth has "no appropriative, statutory or preemptive rights to the water in Strafford county and especially to that in the Bellamy River project, and Portsmouth and the United States of America, jointly and severally, are attempting to deprive the petitioners of said rights and to destroy their interest therein, and the U.S.A. is acting as the agent, servant and representative of Portsmouth and is without authority to do so." They further allege that the plaintiffs have prior appropriative statutory preemptive rights in the water and that the use of the water for the sole benefit of Portsmouth constitutes taking the plaintiffs' property without due process of law and is unconstitutional.

The Legislature by Laws 1891, chapter 209, authorized Portsmouth which had acquired the stock of the corporation known as the Proprietors of the Portsmouth Aqueduct to possess the rights, powers, privileges, franchises and property of said proprietors in the same manner as if the same had been granted to the city. Section 3 of said chapter further provided authority, if required and necessary in the enlargement and improvement of said water works or in the construction of other water works, to acquire additional lands, water rights, easements and privileges either through purchase of the same from the owners thereof; or if unable to agree upon a price to be paid for such lands that the city could apply to the Supreme Court at any trial term thereof in the county of Rockingham for appraisal. By chapter 205, Laws 1899, the city was given additional "exclusive" rights to extend its water service to the towns of Greenland, Newington, New Castle and part of the town of Rye and for that purpose additional powers of eminent domain and rights

in streets in the area were specifically granted.

Under the provisions of RSA 38:12 a municipality which has acquired the plant, property, or facilities of a public utility in any other municipality, may thereafter operate therein as a public utility with the same rights and franchises which the owners of such outlying plant, as purchased, would have had had such purchase not been made. It is thus lawful for a municipality to own land in another community for the purposes of a water supply. *Keene* v. *Roxbury*, 97 N. H. 82.

The plaintiffs admit that the Government had the right and authority to take by eminent domain the necessary acreage and water rights for the construction of the Bellamy River dam for public uses to provide an adequate water supply for the Pease Air Force Base and they raise no objection so long as the Government owns and operates the dam. But they do object to giving Portsmouth the sole and exclusive use of the dam and the water impounded thereby, although they are willing to give Portsmouth preference to such an amount of water as the Court determines it is entitled to. The plaintiffs say they are not only asking for adjudication of the rights to use of the Bellamy River water, but also for an administration of such rights by turning the dam over to the State to be administered by the Water Resources Board. They contend that jurisdiction over the United States as a party to these proceedings is given by the provisions of 43 U.S.C., *s.* 666 known as the McCarran Amendment which provides: "(a) . . . Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances. . . ."

The most important case construing this section is *Dugan* v.

*Rank*, 372 U. S. 609. This case dealt with the Central Valley Reclamation Bureau of California authorized by Congress to conserve and put to maximum use the water of the Central Valley of California. The plaintiffs in that case claimed the rights along the San Joaquin River below the Friant Dam in California and brought their action against local officials of the Bureau of Reclamation, certain irrigation and utility districts, and also the United States Government itself, seeking to prevent the storing and diverting of water at the dam. The District Court held there was jurisdiction over the United States under section 666. The Court of Appeals however in *State* v. *Rank*, 293 F. 2d 340 (1961) reversed the District Court holding that the Government could not be made a party without its consent and held that said section 666 did not apply to the facts because all of the claimants to such water rights had not been joined and that the controversy was a private one between the plaintiffs and the United States or officials of the Bureau of Reclamation, a division of the United States Government. In that opinion the court stated "There can be little doubt as to the type of suit Congress had in mind. It was not a private dispute between certain water users as to their conflicting rights to the use of waters of a stream system; rather, it was the quasi-public proceeding which in the law of western waters is known as a 'general adjudication' of a stream system: one in which the rights of all claimants on a stream system, as between themselves, are ascertained and officially stated." *Id.*, 347.

The intent and purpose of section 666 is further clarified by the Senate report on the bill which in substance reports that the purpose of the amendment was that all claimants be required to prove their claims and that none could refuse without forfeiting his claim and that all claims have the same relation to the proceedings. The report went on to say, "It is intended to be universal and to result in a complete ascertainment of all existing rights, to the end, first, that the waters may be distributed, under public supervision, among the lawful claimants according to their respective rights without needless waste or controversy. . . ." S. Rep. No. 755, 82d Congress, 1st Session 5 (1951). See *Pacific Live Stock Co.* v. *Lewis*, 241 U. S. 440.

The opinion of the Court of Appeals was approved in *Dugan* v. *Rank*, 372 U. S. 609, 617, 618. The court said in part, "We agree with the Court of Appeals on this issue and therefore

do not consider the contention at length. It is sufficient to say that the provision of the McCarran amendment . . . 43 U.S.C., *s.* 666, relied upon by respondents and providing that the United States may be joined in suits 'for the adjudication of rights to the use of water of a river system or other source,' is not applicable here. Rather than a case involving a *general* adjudication of 'all of the rights of various owners on a given stream,' S. Rep. No. 755, 82d Cong., 1st Sess. 9 (1951), it is a private suit to determine water rights solely between the respondents and the United States and the local Reclamation Bureau officials. In addition to the fact that all of the claimants to water rights along the river are not made parties, no relief is either asked or granted as between claimants, nor are priorities sought to be established as to the appropriative and prescriptive rights asserted." See also, *Fresno* v. *Cal.*, 372 U. S. 627; *Nevada* v. *United States*, 279 F. 2d 699, 701 (9th Cir. 1960).

In *Miller* v. *Jennings*, 243 F. 2d 157 (5th Cir. 1957) the court held that in a suit for declaratory judgment as to water rights where the plaintiffs prayed for a declaration of their rights and for an injunction the District Court properly refused to entertain the suit where all persons having an interest in the subject matter of the suit were not parties thereto or members of a class represented by the parties to the suit. It was urged there as here by the plaintiffs that all persons having an interest in the subject matter of the suit are parties of or members of a class represented by the parties to the suit. As to this contention the court said at page 160 "The declaratory judgment would be binding only on those parties actually before the court; each new party asserting his rights in the waters of the river, in the same or any other court, would have the right to relitigate the questions already adjudged as between those before the court."

The claim advanced by the city of Dover as to its water rights in the Bellamy River is that since 1889 it "was the beneficial owner and user, presently and prospectively, of all certain underground, percolating, subterranean streams and water stratas underlying certain lands in Dover . . . into Madbury, which is referred to as the Dover-Madbury Aquifer." Laws 1881, *c.* 256, *s.* 18; Laws 1889, *c.* 170, *s.* 1; Laws 1913, *c.* 338, *s.* 1; *c.* 424, *s.* 1; Laws 1929, *c.* 329, *s.* 19.

However the plaintiffs have not alleged ownership in the land taken for the dam or any present use of the water in Bellamy

River or any unreasonable interference with the use of the water, which is surplus surface water rather than percolating or subterranean water. *Whittier* v. *Cocheco Mfg. Co.,* 9 N. H. 454, 460; *Bassett* v. *Company,* 43 N. H. 569.

The right of riparian owners to the use of streams of water running upon the surface is a natural right incident to the land "to partake in the enjoyment of the common bounty of Providence, as in the cases of light and air." *Swett* v. *Cutts,* 50 N. H. 439, 443, 444. These rights arise out of ownership. *Concord Co.* v. *Robertson,* 66 N. H. 1.

The city of Portsmouth gave up its chief source of water supply in consideration of the Government's promise to furnish a replacement supply of like quantity and quality. No offer is made here by the plaintiffs to compensate either the Government or Portsmouth for use of the impounded water other than an expression of willingness to give the Air Base and Portsmouth priority up to the extent of their needs. Portsmouth is under obligation by contract with the Government to sell water to the Government to the extent (as the defendants contend) of two million gallons per day. The Government pursuant to its agreement took the lands on the Bellamy River by eminent domain and constructed the dam and deeded it to Portsmouth in lieu of damages for acquiring the city's water supply located within the Air Base area. *Brown* v. *United States,* 263 U. S. 78; *United States* v. *Miller,* 317 U. S. 369.

None of the riparian owners of Bellamy River have been joined as parties to this action, consequently no declaratory judgment entered therein could bind them. *Miller* v. *Jennings, supra.* Furthermore this is not a class action to adjudicate the rights of all the owners in a stream generally but rather a private suit between the plaintiffs and the Federal Government and Portsmouth. On the facts alleged 43 U.S.C., s. 666, *supra,* may not be invoked to confer jurisdiction over the United States. *Dugan* v. *Rank, supra.* The petition alleges no facts which if proved would establish that the plaintiffs' rights in the premises are superior to those of the city of Portsmouth.

Accordingly the order is

*Petition dismissed.*

All concurred.