Max E. TURNER et al., Appellants,

v.

KINGS RIVER CONSERVATION DIS-
TRICT et al., Appellees.

No. 19426.

United States Court of Appeals
Ninth Circuit.

March 8, 1966.

As Modified on Denial of Rehearing
June 8, 1966.

Wilmer W. Morse, Sacramento, Cal., for appellants.

Barrett, Wagner & Dietrich, Richard W. Dietrich, Fresno, Cal., for Liberty Farms Mutual Water Co.

Crowe, Mitchell, Hurlbutt & Clevenger, J. Thomas Crowe, Visalla, Cal., for Alta Irrigation Dist.

William F. Docker, of Docker, Docker, Perkins & Shelton, Fresno, Cal., for Burrel Ditch Co., Kings River Conservation Dist., Liberty Canal Co., and Reed Ditch Co.

John M. Fleharty, of Fleharty, Berg & Guntner, Fresno, Cal., for Crescent Canal Co.

Walter M. Gleason, San Francisco, Cal., for Salyer Water Dist.

Denslow Green, of Green & Green, Madera, Cal., for Tranquillity Irrigation Dist.

Dan Hadsell, Berkeley, Cal., J. G. McCain, Corcoran, Cal., for Tulure Lake Basin Water Storage Dist.

Pat S. McInturff, of Hagen & McInturff, Hanford, Cal., for John Heinten Mutual Water Co.

Charles W. Jennings, Lemoore, Cal., for Laguna Irrigation Dist., Empire West Side Irrigation Dist., Riverdale Irrigation Dist., Liberty Mill Race Co., Stratford Irrigation Dist., and Clarks Fork Reclamation Dist. No. 2069.

J. G. McCain, Corcoran, Cal., for J. G. Boswell Co., Corcoran Irrigation Co., Peoples Ditch Co., Southeast Lake Water Co., and Tulare Lake Canal Co.

William M. Miles, of Miles, Sears & Franson, Fresno, Cal., for Consolidated Irrigation Dist. and Kings River Water Dist.

Richard H. Peterson, F. T. Searls, W. B. Kuder, John B. Gibson, San Francisco, Cal., for Pacific Gas & Electric Co..

Robert R. Rosson, of Rosson & Pearson, Hanford, Cal., Walter M. Gleason, San Francisco, Cal., for Lemoore Canal & Irrigation Co.

Rowell, Lamberson & Thomas, Breckinridge Thomas, Fresno, Cal., for Kings River Water Ass'n.

Richard L. Shepard, of Savage & Shepard, Fresno, Cal., for Stinson Canal & Irrigation Co., James Irrigation Dist., and Dick Lovelace.

Stammer, McKnight, Barnum, Bailey & Barnett, Galen McKnight, Fresno, Cal., for Fresno Irrigation Dist.

Lyman Griswold, of Walch, Griswold, Braden & Dittman, Hanford, Cal., for Last Chance Water Ditch Co.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, David R. Warner, Attys., Dept. of Justice, Washington, D. C., for appellees Arthur R. Frye, Jr., Robert E. Mathe, Alfred E. Plummer, and R. J. Pafford, Jr.

Before HAMLIN, BROWNING, and DUNIWAY, Circuit Judges.

BROWNING, Circuit Judge.

This litigation arises out of the operation of the Pine Flat dam and reservoir, built by the United States on the Kings River in California pursuant to the Flood Control Act of 1944, 58 Stat. 901. Plaintiffs, appellants here, claim rights under state law to use Kings River water on their riparian and overlying lands. Four of the defendant-appellees are employees of the Bureau of Reclamation and Corps of Engineers and are responsible for storing and releasing waters

at Pine Flat dam. The remaining defendant-appellees claim rights under state law to use Kings River water on non-riparian lands on the basis of appropriation. Appellants alleged that the appellee government employees and appellee water appropriators stored and released water at Pine Flat dam in such a way as to interfere with appellants' riparian water rights. They sought an injunction. The district court dismissed the action on the complaint alone. We affirm.

Appellants attempted to state three causes of action.[1]

The first cause of action named only the appellee government officials as defendants. It alleged that Pine Flat dam was owned by the United States and was operated by the defendant officials. It alleged that these officials "wrongfully and unlawfully" diverted waters of Kings River to storage in Pine Flat reservoir for irrigation purposes, thus reducing the flow of the river, presenting waters of the river from flowing as they had in a state of nature, and depriving appellants of the reasonable and beneficial use of the waters in violation of their rights as riparian and overlying landowners. Appellee officials were alleged to have exceeded their authority in the following respects: First, it was alleged that they inter-

fered with appellants' vested water rights under state law contrary to section 8 of the Flood Control Act of 1944, 58 Stat. 891, 43 U.S.C.A. § 390. Second, it was alleged that they stored water in Pine Flat reservoir for purposes other than flood control without a permit required by sections 225 and 1252 of the Water Code of California, in violation of section 8 of Reclamation Act of 1902, 32 Stat. 390, 43 U.S.C.A. § 383. And, third, it was alleged that they diverted water to lands held in private ownership by a single owner in excess of 160 irrigable acres, in violation of section 5 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C.A. § 431, and of section 46 of the Omnibus Adjustment Act of May 25, 1926, 44 Stat. 650, 43 U.S.C.A. § 423e.

Appellants' second cause of action added as defendants the appellee water appropriators and the Kings River Water Association. It alleged that a contract to store and release water at Pine Flat dam was entered into between appellee Dugan, who was "purporting to act" as Regional Director of the Bureau of Reclamation, and appellee Kings River Conservation District, which was representing the appellee water appropriators. Certain provisions of the contract were alleged in the complaint and are set out below.[2] It was alleged that pursuant to this con-

---

1. The theory of the complaint is clarified in appellants' brief on appeal. Brief of Appellants 23–24, 27–49.

2. Provisions of the contract set out in the complaint read as follows:

"RESERVOIR OPERATION

2. (a) The District, at any time during the term hereof, and at its option, may request the United States to store water in the reservoir of the Project for irrigation, and the United States shall release water so stored when and at the rate requested by the District. The foregoing rights of the district to store water shall be subordinate to the use and operation of the Project for flood control purposes, and the extent and method of said flood control usage shall be determined by the United States Army, Corps of Engineers.

(b) The District, acting by and through the Kings River Water Asso-

ciation, or any successor to said association, as enunciated in Article 2(c) hereof, shall notify the United States, from time to time, of the rate at which water shall be stored and released for irrigation. The United States shall honor these notices and shall operate the reservoir of the Project in accordance therewith, subject to the aforementioned flood control usage. * * *

(c) The Kings River Water Association, or any successor which shall succeed to its powers under the Indenture and Agreements in this article described, as agent for the parties to said indenture and agreements, shall administer the diversion into storage regulation and release of water in accordance with and in furtherance of the rights and applications of the parties to the Water Right Indenture of May 3, 1927, recorded in the office of the County Re-

tract, the Kings River Water Association notified the United States of the quantities of water the Association desired to be stored and released in Pine Flat reservoir, and that appellee officials stored and released water accordingly. The second cause of action repeated the allegation that these diversions adversely

corder of the County of Fresno, State of California, in Volume 819, Official Records, at page 431, et seq., the Administrative Agreement of May 3, 1927, in the possession of the Association, the Agreement Supplementing and Amending Water Right Indenture, dated May 3, 1927, and supplementing and amending the Administrative Agreement dated May 3, 1927, executed on June 1, 1949, and recorded on January 27, 1950, in the office of the County Recorder of the County of Fresno, State of California, in Volume 2817 of Official Records, at page 75, et seq., and the amended Kings River Monthly Diversion Schedule attached thereto and made a part thereof, and any amendments and supplements thereto and any storage or release agreements, regulations, or instructions which may hereafter be adopted by the members of said Association.

(d) The execution of this contract and the performance of its terms shall not in any manner reduce or prejudice any of the water rights and applications therefor, present or future, of any of the members of the Association in or to any of the water of Kings River whether in natural direct flow or under storage control or release, or in or under any of the agreements mentioned in Article 2(c); and the District hereby recognizes and acknowledges all water rights existing under the laws of the State of California and agrees not to interfere therewith or do anything in prejudice thereof."

"COMPUTATION OF PAYMENT BY DISTRICT

3. The computation of the payment or payments to be made pursuant to Article 4 hereof, shall be made as follows:

(a) When water stored in the reservoir for the district is decreased either by releases at the request of the district, or by the district exchanging with the Pacific Gas and Electric Company, said stored water for water furnished to the Pacific Gas and Electric Company pursuant to its contract with the United States (No. 14–06–200–3101), said decreases in stored water shall be measured as daily amounts at the reservoir and shall be paid for at the rate of One Dollar and Fifty Cents ($1.50) per acre-foot.

(b) When stored water is being released in excess of the amounts requested by the District, payment shall be at the rate of One Dollar and Fifty Cents ($1.50) per acre-foot for the amount of the actual total irrigation diversions of all units participating in storage in excess of the total entitlements of those units, as determined from the preproject Piedra flow and the Kings River Monthly Diversion Schedule, mentioned in Article 2(c) hereof. Measurements of actual irrigation diversions shall be made at the headgates, and diversions and entitlements shall be measured as mean daily values."

\* \* \* \* \*

"RELEASE

8. (a) The District agrees to indemnify and hold the United States harmless from any liability, responsibility, damage or claim of damage arising as the result or alleged result of the storing or release of water for irrigation purposes pursuant to this contract.

(b) The United States shall not be liable or responsible for the carriage, distribution, or division of water for irrigation purposes after its release from the reservoir, or for any loss or damage of any type or description arising therefrom, and the District agrees to indemnify and hold the United States harmless from any liability or responsibility arising therefrom.

(c) The District does not agree to indemnify against any obligation or liability arising out of operation of the Project for flood control purposes. The United States shall not be responsible for loss of water to which the District or those claiming by, through or under the District are entitled and which has been stored in the reservoir of the Project and which has been released as a result of the operation of the Project for flood control purposes."

In addition, the complaint alleged a contract for the storage of water at Pine Flat reservoir between the United States and the Pacific Gas and Electric Company, which is also named as a defendant. Appellant made no argument based upon these allegations either in the trial court or in this court, and we therefore do not discuss them.

affected appellants' water rights. The diversions were alleged to be beyond the authority of the appellee officials for the three reasons stated in the first cause of action, and for the additional reason that the appellee officials were prohibited from contracting with local interests for operation of the reservoir by section 10 of the Flood Control Act of 1944, 58 Stat. 901.[3]

Appellants' third cause of action was one to quiet title to their water rights under state law. It was alleged to be within the district court's pendent jurisdiction.[4]

The district court dismissed the complaint because the United States was an indispensable party, and because it had not consented to be sued in the district court for injunctive relief. Leave was granted to file an amended complaint under the McCarran Act, 66 Stat. 560, 43 U.S.C.A. § 666, joining the United States as a defendant and seeking an adjudication of all water rights in the Kings River. Appellants declined to replead, and the action was dismissed.

The district court did not determine whether the alleged acts of appellee officials were within their authority. Instead, the court stated that even if their conduct were unauthorized the suit could not be maintained in the absence of the United States because the injunction which the appellants sought "would inevitably restrain the Government from acting or require [it] to act in such a way as to deprive it of the full use and control of its facilities at the dam."

The United States urges us to affirm on the same basis. It relies upon Chief Justice Vinson's statement in footnote 11 of his opinion in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 691, 69 S.Ct. 1457, 1462, 93 L.Ed. 1628 (1949), that "a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property." The government argues from this, and from its reading of Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), that there exists a broad rule that a suit may not be maintained against government officers for unauthorized or unconstitutional acts if the relief would "expend itself on the property of the United States" or would "require affirmative action by the sovereign."

Giving full scope to Justice Vinson's statement, it does not control this case. Appellants' water rights could be fully protected simply by enjoining the government officials from interfering with the natural flow of the river to the extent necessary to satisfy those rights. And such an injunction would not involve "the disposition of unquestionably sovereign property."

Moreover, we think the Supreme Court's more recent statement of the rule in Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999 (1963), casts doubt upon Justice Vinson's formulation, at least as broadened by the government's argument here. In Dugan v. Rank Justice Clark said, "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" 372 U.S. at 620, 83 S.Ct. at 1006.[5] Justice Clark analyzed the decree entered by the district court in Dugan v. Rank in the light of this "general rule" and concluded that the decree "operates against the United States." He then continued, "Nor do we believe that the action of the Reclamation Bureau officials falls within either of the recognized exceptions to the above general rule * * *. Those exceptions are (1) action by officers beyond

3. Appellants' Brief 24, 47–49.

4. Appellants' Brief 17–18.

5. See also State of Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963).

their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void. In either of such cases the officer's action 'can be made the basis of a suit for specific relief against the officer as an individual.'" 372 U.S. at 621–622, 83 S.Ct. at 1007 (citations omitted).

■ We conclude from this that although the relief sought may be such that under the "general rule" a suit would appear to be one against the sovereign, the action is nonetheless maintainable against government officers under the two "exceptions" to the "general rule" if the acts of the officers were prohibited by statute or the Constitution. See also Malone v. Bowdoin, 369 U.S. 643, 647–648, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Boesche v. Udall, 373 U.S. 472, 476–477, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963).

We would hesitate the more to bar this suit on the ground urged by the government in view of the recent history of Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937). That case held that the United States was not an indispensable party to a suit to enjoin the Secretary of Interior from enforcing an allegedly unauthorized order interfering with plaintiffs' vested rights to water from a reclamation project. Some doubt was cast upon this holding in Larson v. Domestic & Foreign Commerce Corp., supra, 337 U.S. at 702, n. 26, 69 S.Ct. 1457. But

as recently as Arizona v. California, 373 U.S. 546, 585, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), Ickes v. Fox again was cited by the Supreme Court in support of a broad power of judicial review of unauthorized acts of the Secretary of Interior in contracting for the distribution of water. See also State of Nebraska v. State of Wyoming, 325 U.S. 589, 612–616, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945).

We must therefore decide whether the alleged acts of appellee officials exceeded their statutory authority in the respects alleged by appellants.[6]

*First* Appellants' most impressive contention is that the statute providing for the construction and operation of Pine Flat dam did not authorize the taking of appellants' water rights, but, on the contrary, imposed an affirmative duty upon government officials to refrain from interfering with those rights. We reject the argument—though not without doubt.

Appellants rely upon language in the preamble and in section 8 of the Flood Control Act of 1944, 58 Stat. 887. The preamble of the Act announces that it is the policy of Congress to recognize state interests in water utilization and to protect "established and potential uses" of the nation's rivers. It provides that use of water "for navigation" shall not conflict with "present or future" use "for domestic, municipal, stock water, irrigation, mining, or industrial purposes."[7] Section 8 of the Act is set out in full be-

---

6. "And, since the jurisdiction of the court to hear the case may depend, as we have recently recognized, upon the decision which it ultimately reaches on the merits, *it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies.*" Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690, 69 S.Ct. 1457, 1461 (1949). (Emphasis added.)

7. The preamble of the Act also declares it to be the policy of Congress "to recognize the interests and rights of the States * * * in water utilization and control * * * and * * * to preserve and protect to the fullest possible extent

established and potential uses for all purposes, of the waters of the nation's rivers." It further provides, "In conformity with this policy: * * * (b) The use for navigation, in connection with the operation and maintenance of such works * * * of waters * * * shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes." Flood Control Act of 1944, 58 Stat. 887, 888, 889, 33 U.S.C.A. § 701–1.

low.[8] Appellants rely upon a clause appearing in the third sentence, which reads "but the foregoing requirement shall not prejudice lawful uses now existing."

Appellants argue that this language of the preamble and section 8 of the Flood Control Act of 1944 means that appellee officials were not to interfere with appellants' water rights in the construction and operation of projects authorized by the Act, including Pine Flat dam.

Appellants point out that extensive reports on the proposed Pine Flat project were submitted to Congress by the Corps of Engineers (H.R.Doc. No. 630, 76th Cong., 3d Sess.) and the Bureau of Reclamation (H.R.Doc. No. 631, 76th Cong., 3d sess.). These reports informed Congress that Kings River basin was highly developed; that an elaborate and substantially complete irrigation system, constructed and operated by private local interests, was already in existence; and that water rights in the area were complex and involved, and covered all available water.[9] The Bureau of Reclamation recommended that these water rights "remain unchanged and unaffected" (H.R. Doc. No. 631, 76th Cong., 3d sess., p. 12). The Corps of Engineers recommended that responsibility for the operation of irrigation aspects of the project be placed in the hands of the "local interests." H. R.Doc. No. 630, 76th Cong., 3d sess., p. 4). Neither report proposed (expressly, at least) that water rights be acquired by the United States; nor did later reports, containing cost estimates for the project. See H.R.Doc. No. 367, 81st Cong., 1st sess., p. 4, and H.R.Doc. No. 136, 80th Cong., 1st sess., p. 17.

Appellants also point out that the contract between the United States and Kings River Water District (note 2, supra) required the district to recognize existing water rights and agree "not to interfere therewith or do anything in prejudice thereof." Par. 8(d). They call attention to a letter addressed to appellants by the Secretary of Interior on November 21, 1962, referring to this provision of the contract, and stating, "The law under which these contracts are authorized does not contemplate interference with valid and existing rights of non-contracting parties."

Finally appellants suggest that the present case differs in a number of respects from Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999 (1963), the government's principal authority. They argue that in *Rank* the need to acquire private water rights was more obvious, and, unlike the

8. "Sec. 8. Hereafter, whenever the Secretary of War determines, upon recommendation by the Secretary of the Interior that any dam and reservoir project operated under the direction of the Secretary of War may be utilized for irrigation purposes, the Secretary of the Interior is authorized to construct, operate, and maintain, under the provisions of the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto), such additional works in connection therewith as he may deem necessary for irrigation purposes. Such irrigation works may be undertaken only after a report and findings thereon have been made by the Secretary of the Interior as provided in said Federal reclamation laws and after subsequent specific authorization of the Congress by an authorization Act; and, within the limits of the water users' repayment ability such report may be predicated on the allocation to irrigation of an appropriate portion of the cost of structures and facilities used for irrigation and other purposes. Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for irrigation purposes only in conformity with the provisions of this section, *but the foregoing requirement shall not prejudice lawful uses now existing; Provided,* That this section shall not apply to any dam or reservoir heretofore constructed in whole or in part by the Army engineers, which provides conservation storage of water for irrigation purposes." Flood Control Act of 1944, § 8, 58 Stat. 891, 43 U.S.C.A. § 390. (Emphasis added.)

9. See also Hearings Before the House Committee on Flood Control on H.R. 4485, 78th Cong., 2d sess., p. 767; Hearings Before Senate Committee on Commerce on H.R. 4485, 78th Cong., 2d sess., pp. 301–02.

present case, the government had requested and obtained appropriations from Congress to acquire private water rights, 372 U.S. at 613–614, 83 S.Ct. 999. Moreover, the statutory authorization for physical seizure of private water rights was substantially clearer in *Rank* than in the present case.[10]

■ As persuasive as these factors may appear to be, on balance we think they are outweighed by those which support the conclusion that appellee officials were authorized to interfere with appellants' rights in the manner alleged in the complaint, and that appellants' remedy was not an action in the district court for an injunction but a suit in the Court of Claims for damages.

Section 8 of the Flood Control Act of 1944 authorizes the Secretary of Interior to operate and maintain structures such as Pine Flat dam "under the provisions of the Federal Reclamation laws (Act of June 17, 1902, 32 Stat. 388 and Acts amendatory or supplementary thereto)," thus making section 7 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C.A. § 421, applicable to the irrigation features of the Pine Flat project. See 41 Op.A.G. 377; Inter-University Case Program Committee on Public Administration Cases, The Kings River Project in the Basin of the Great Central Valley 44–47 (1949); Maas, 38 Calif.L.Rev. 666, 688

(1950); Taylor, 46 Colum.L.Rev. 153, 166–70 (1958); see also Graham, 38 Calif.L.Rev. 588, 629–30 (1950). Section 7 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C.A. § 421, provides that in carrying out the Federal Reclamation laws the Secretary of the Interior may "acquire any rights or property," "by purchase or by condemnation under judicial process." We held in State of Cal. v. Rank, 293 F.2d 340, 354–355 (9th Cir. 1961), that this authorization extends to the taking of private water rights by physical seizure as well as by purchase or formal condemnation.[11] Appellants concede as much. Their argument, in effect, is that the preamble and section 8 of the Flood Control Act of 1944 are savings clauses intended to except the Pine Flat dam and other projects authorized by the Flood Control Act of 1944 from the grant of eminent domain in section 7 of the Reclamation Act of 1902.

■ The provision of the preamble upon which appellants rely (58 Stat. 887, 33 U.S.C.A. § 701–1) would appear to mean only "that in the operation of * * [projects authorized by the Act] the use of water for navigation will be subordinate to present and future beneficial consumptive uses—in other words, irrigation ditches will never be closed to supply water to float barges." Trelease, 69 Wyo.L.J. 189, 196 (1965).[12] Appellants

---

**10.** See Dugan v. Rank, 372 U.S. at 619, 83 S.Ct. 999. In *Rank* the applicable statutory provision was § 2 of the River and Harbors Act of 1937, 50 Stat. 850, which authorized the Secretary to "acquire by proceedings in eminent domain, *or otherwise*, all lands, rights-of-way, *water rights*, and other property necessary for said purposes." (Emphasis added.)

**11.** On appeal, the Supreme Court approved this result, although not necessarily upon the basis of § 7 of the Reclamation Act of 1902, since an alternate source of statutory authority (50 Stat. 850, see note 10, supra) was also available. 372 U.S. at 619, 622, 83 S.Ct. 999.

**12.** Congressman Whittington, Chairman of the Committee which handled the Flood Control Act of 1944, stated on the floor of the House:

"There is no occasion for the West to be apprehensive. I favor the utilization of waters within the States for domestic uses and for irrigation. I want to protect citizens of other parts of the country in their riparian privileges and in the enjoyment of their riparian rights. All such rights whether in the West or elsewhere along the navigable rivers are subordinate to improvements in the discretion of Congress for flood control and navigation. The rights of the West are safeguarded in the bill. The Western States are protected in the continued utilization of the water resources under existing law. No existing law whether State or Federal is valid unless it is constitutional. Quibbling, misinterpreting, or misrepresenting with respect to existing legislation, whether State or Federal, can only hurt the cause of reclamation. Flood-control

do not allege that Pine Flat water is being used in aid of navigation. Use for this purpose was not contemplated. See S.Doc. No. 113, 81st Cong., 1st sess., p. 169; H.R.Doc. No. 631, 76th Cong., 3d sess., p. 26.

While the words of the preamble of the Act may indeed reflect a concern that state-created private water rights be protected, the hazard sought to be avoided was not that federal officers would take such rights by eminent domain, in return for just compensation. Rather, the language was intended to prohibit destruction of state-created water rights without any compensation at all, by the assertion of an overriding federal easement for navigation. See Trelease, 69 Wyo. L.J. 189, 196, 198–99, 200–02, 1965. See also United States v. Gerlach Live Stock Co., 339 U.S. 725, 731–742, 70 S.Ct. 955, 94 L.Ed. 1231 (1950); see generally, Morreale, 3 Natural Resources Jnl. 1 (1963); Trelease, 10 Buffalo L.Rev. 399, 405–06 (1961).

The language of section 8 of the Flood Control Act of 1944 is also inappropriate to express the purpose that private water rights were not to be taken. As appears from the context, the clause, "but the foregoing requirement shall not prejudice lawful uses," refers to existing uses to which War Department projects were being devoted at the time the Act was passed. The clause was intended to relieve these arrangements for use, which antedated the Act, from the new requirement that "Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for irrigation purposes only in conformity with the provisions of this section." This language does not suggest that Congress had in mind protection of individual water rights as such,[13] nor that Congress intended to prohibit the taking of private water rights by eminent domain if that became necessary in the operation of a project.

Moreover, the natural reading of the language limits its application to dams and reservoirs in existence when the Act was passed. This would exclude the Pine Flat project without more, for it had not then been built. The legislative history supports this construction. As it originally passed the House, the provision of the Flood Control Act of 1944 which became section 8 did not contain the eleven-word clause upon which appellants now rely. Instead, it ended with a proviso reading "That this section shall not apply to any dam or reservoir *heretofore* constructed which supplements any existing locally operated irrigation districts." See Hearings Before Senate Subcommittee on Commerce on H.R. 4485, 78th Cong., 2d sess., p. 2. (Emphasis added.) The present language, including the words "but the foregoing requirement shall not prejudice lawful uses now existing," was substituted at the suggestion of the Secretary of Interior, for "technical" reasons, and not to alter the section's meaning. Hearings Before Senate Committee on Commerce on H.R. 4485, 78th Cong., 2d sess., pp. 313, 458.[14] Thus, the disputed clause was intended to

---

projects in the West have been constructed along the Sacramento River and other streams for years. No conflict with respect to the domestic use of water, or the use of water for irrigation has arisen." 90 Cong.Rec. 4124 (1944).

The same intention to deal with priority among the purposes for which water was to be used, rather than with private water rights, as such, is indicated in the Senate consideration both of the preamble and of § 6 of the Act. 90 Cong. Rec. 8547–48 (1944). See also S.Rep. No. 1705, 85th Cong., 2d sess., pp. 133–34 (1958); 104 Cong.Rec. 11497 (1958).

13. It was proposed in the Senate that § 8 be amended to read: "The provisions of this section shall not prejudice lawful uses then existing *nor water rights or priorities established under applicable state laws * * *"* 90 Cong.Rec. 8550 (1944). (Emphasis added.)

14. When the committee adopted the Secretary of the Interior's proposed amendment, it did not delete from the bill the language "Provided, that this section shall not apply to any dam or reservoir heretofore constructed which supplements any existing locally operated irrigation districts." (S.Rep.No.1030, 78th Cong., 2d

have the same effect as the earlier language, which was to exclude from the operation of the section dams and reservoirs constructed before the Act was adopted.[15] This interpretation is further supported by the fact that the Senate specifically rejected an amendment which would have made the section inapplicable to any dam *"heretofore or hereafter* constructed which supplements any existing locally operated irrigation system or other locally operated water facilities * * * ."* 90 Cong.Rec. 8550 (1944). (Emphasis added.)[16]

Appellants argue that a construction which limits application of the clause in question to dams in existence when the Act was passed would render the present proviso of section 8 superfluous. But the proviso and the disputed clause do not say precisely the same thing. As we have seen, the clause applies to "uses now existing" of an existing dam and reservoir. The proviso, on the other hand, applies to an existing dam and reservoir "which provides conservation storage of water for irrigation purposes"—without regard to whether this storage space was actually committed to a particular use at the time the Act was passed. The present proviso was added as a floor amendment for the express purpose of assuring that section 8 would not apply to the Caddoa project on the Arkansas River, where the dam was in existence and storage space for conservation purposes had been built into the project, but the particular use of this space had not been finally determined because of a dispute between the states of Kansas and Colorado.[17]

Finally, we note that the Supreme Court refused to read a prohibition against taking private water rights by eminent domain into much stronger language. Section 8 of the Reclamation Act of 1902, 32 Stat. 390, 43 U.S.C.A. § 383, provides that "nothing in this act shall be construed * * * to in any way interfere with the laws of any State or Territory relating to the * * * distribution of water used in irrigation, or any vested right acquired thereunder and the Secre-

---

sess., p. 4.) This language was stricken on the floor of the Senate. 90 Cong.Rec. 8552 (1944).

15. A contrary argument could be made from a remark of Congressman Whittington during House consideration of the original language. Congressman Whittington stated that the original language was intended "to limit the provisions of this act so that they shall not apply to districts with *canals and distribution facilities* that have already been paid for and constructed by local interests." 90 Cong.Rec. 4204 (1944). (Emphasis added.) This would appear to indicate that the earlier language was intended to make § 8 inapplicable where canals and other irrigation facilities constructed by local interests were in existence even though the federal dam was not, as in the present case. But see note 16.

16. The legislative history of this and other amendments is reviewed in 41 Op.A.G. 377, 389–94, with the following conclusion: "It will be recalled that these amendments had as one of their purposes exemption from the reclamation laws of projects in areas where private irrigation systems already existed. At no point in the discussion of those amendments was it ever suggested that this proposal was in fact incorporated in the bill, and the subsequent statements of Senator Overton, made in the course of the discussion of the Murray amendments, are clearly to the contrary."

17. Senator Millikin, who proposed the amendment, explained his purpose in these words (90 Cong.Rec. 8552 (1944)):
"I should like to explain the purpose of that amendment. It is in the O'Mahoney amendment, but was not in the bill as it came from the House. In the late 1930s an able Representative from Colorado initiated the steps which resulted in a so-called Caddoa Dam on the Arkansas River. It was an odd project, in which irrigation storage was planned and built into it from the beginning, but there were no provisions in the enabling law as to how that storage should be financed, or how it should be handled. Since then there has been a water dispute between the State of Kansas and the State of Colorado involving, among other things, the waters stored in that reservoir. So we do not wish to do anything here that could possibly prejudice these situations. The language which I have proposed will protect them."

tary of Interior * * * shall proceed in conformity with such laws, and nothing herein shall affect any right * * * of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof." The Supreme Court held that this language requires federal officers to recognize state-created water rights and pay for them if taken, but that it did not limit the authority of federal officers to take such rights for just compensation. City of Fresno v. State of California, 372 U.S. 627, 629–630, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963); Ivanhoe Irr. Dist. v. McCracken, 357 U.S. 275, 291, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), and, by implication, Dugan v. Rank, 372 U.S. 609, 619–623, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), and United States v. Gerlach Live Stock Co., 339 U.S. 725, 739–740, 70 S.Ct. 955 (1950). See also State of Arizona v. State of California, 373 U.S. 546, 586–587, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).

Turning from the statutory language, we think the reports which the Corps of Engineers and Bureau of Reclamation submitted to the Congress proposing the Pine Flat project (H.R. Docs. Nos. 630 and 631, 76th Cong., 3d sess.) support the conclusion that Congress intended appellee officials to operate the Pine Flat facilities essentially as they are alleged to have operated them—by way of contracts with local water users; and we find no convincing evidence that Congress intended to prohibit absolutely any interference by appellee officials with downstream riparian rights incident to such operations.

As we have said (note 9 and related text), both reports informed Congress that all available Kings River water was in use by local irrigation interests; and both reports advised Congress to entrust control of irrigation to local interests, and leave local water rights unaffected. The Corps of Engineers report stated, "Water of the Kings River is completely appropriated and is used by controlling interests in accordance with a well-established agreement administered by a watermaster. Years of litigation prior to the establishment of this agreement demonstrated the virtual impossibility of an adjudicated settlement of conflicting rights and therefore its provisions have practically the effect of law." H.R. Doc. No. 630, 76th Cong., 3d sess., p. 7. The agreement referred to was described in great detail in the Reclamation Bureau Report. H.R. Doc. No. 631, 76th Cong., 3d sess., pp. 12–14.[18] Both reports recommended that this agreement, and the formula and mechanism which it established for the distribution of Kings River water, be utilized in the operation of the Pine Flat project. H.R. Doc. No. 630, p. 10; H.R. Doc. No. 631, pp. 11–12. See also Hearings Before House Committee on Flood Control on H.R. 4485, 78th Cong., 2d sess., p. 739. The contract between the United States and the Kings River Conservation District (note 2 and related text) follows this recommendation.

It was clear from both reports that claims based upon interference with the right of downstream riparian owners to use of the natural flow of the river were to be expected. The Corps of Engineers pointed to "a definite need for regulating stream flow in the interests of irrigation" as well as for flood control; and set out a detailed plan for operation of the proposed reservoir which contemplated marked alteration of the normal regime of the river. H.R. Doc. No. 630, pp. 8–9. The Bureau of Reclamation report advised Congress that some water rights were in dispute, that not all claimants had assented to the indenture agreement among the local interests, and that a part of the flow was simply left unapportioned to be utilized by non-participating claimants "in a hit or miss fashion." H.R. Doc. No. 631, pp. 12–15. It was contemplated that water releases would conform to vested irrigation rights, not invariably, but "except in rare cases." H.R. Doc. No. 631, p. V.

18. For further details see Kaupke, Forty Years on Kings River (1957).

Admittedly, appellee officers were authorized to operate the irrigation phases of the project. We conclude from the contents of the two reports that they were also authorized to contract with the appellee local irrigation interests as they did. We think it must follow that they were authorized to act despite claims of interference with downstream riparian rights which were an inevitable consequence of the exercise of their authority.[19]

There is no doubt that the reports of both the Corps of Engineers and the Bureau of Reclamation indicated that private water rights were to be recognized and, so far as possible, left undisturbed. As Congress was aware, this much was required by both agencies as a matter of administrative policy. H.R. Doc. No. 367, 81st Cong., 1st sess., p. 5 (Corps of Engineers policy). Hearings Before House Committee on Flood Control on H.R. 4485, 78th Cong., 1st sess., p. 642; 90 Cong. Rec. 4133–34 (1944); United States v. Gerlach Live Stock Corp., 339 U.S. 725, 734–736, 70 S.Ct. 955, 94 L. Ed. 1231 (1950) (Bureau of Reclamation policy). Reaffirmation of this policy as applied to Pine Flat could not reasonably be taken as a recommendation by these agencies that they be absolutely prohibited from interfering with private water rights where, as here, that course might be necessary, indeed inevitable, in operating the project as planned.[20] Power to take private water rights was found

in *Gerlach* (339 U.S. at 739–740, 70 S.Ct. 955) despite similar assurances to Congress that private water rights would be protected.

We find support for the conclusion that Congress did not intend to deny the power of inverse condemnation to appellee officers by the consequences of a contrary holding. If the officers had no authority to take downstream water rights it might be doubtful whether claimants injured in the daily operations of the project would have a remedy in damages against the United States. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Suits for injunctive relief, such as this, would be proper, and might be expected to arise with some frequency in connection with the operation of a project like Pine Flat dam. Determining whether the remedy for official interference with property in particular situations shall be by way of suits for damages, or by way of "direct judicial interference" with government operations, "is a function of Congress." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 705, 69 S.Ct. 1457 (1949); Jaffe, 77 Harv.L.Rev. 1, 39 (1963). It seems unlikely that Congress preferred the latter remedy in the present situation. Strong policy considerations favor the damage remedy (337 U.S. at 704, 69 S.Ct. 1457), particularly where, as in this case, the right to compensation would appear to

19. Since the officers had authority to interfere with downstream water rights when necessary in the operation of the Pine Flat project, they could not be enjoined for error in the exercise of this power, assuming such error occurred. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689–690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); cf. Note, 70 Harv.L.Rev. 827, 855, 861 (1957). Appellants do not contend to the contrary. They rest their argument upon the premise that appellee officers lacked any authority at all to interfere with private water rights, and not upon the improper exercise of a power to take such rights.

20. The provision in the contract between the United States and the Kings River

Water District requiring recognition of private water rights may be read as an implementation of the general policy to which we have referred. So, too, may the Secretary of Interior's letter of November 21, 1962.

Paragraph 8(a) of the contract requiring the Kings River Water District to hold the United States harmless from any liability for damages arising out of the storing or releasing of water may be regarded as the government's recognition that interference with such private rights was likely to occur, and, so far as the United States was concerned, that the consequence was to be liability for damages.

be an adequate remedy (United States v. Gerlach Live Stock Co., 339 U.S. 725, 752, 70 S.Ct. 955 (1950)), and injunctive relief might interfere with a continuing government program and impede the accomplishment of important government ends. Larson, 337 U.S. at 704, 69 S.Ct. 1457; Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 76 L.Ed. 637 (1932); 3 Davis, Administrative Law § 27.01, p. 146 (1965 Supp.)

The adoption of the McCarran Amendment, 66 Stat. 560, 43 U.S.C.A. § 666, consenting to the joinder of the United States as a defendant in an equitable action "for the adjudication of rights to the use of water of a river system or other source," indicates that Congress did not intend to expose government irrigation projects to the possibility of interruption by individual private injunctive suits to determine water rights. As we noted in State of Cal. v. Rank, 293 F.2d 340, 347 (9th Cir. 1961), the pertinent Senate report reproduces an exchange of correspondence between Senators Magnuson and McCarran which is explicit on this point.[21]

*Second.* We turn to the second ground upon which appellants urge that appellee officers acted without authority: namely, that they stored water in Pine Flat reservoir for irrigation purposes without first obtaining a permit required by state statute. Appellants recognize that "nothing in § 8 [of the Reclamation Act of 1902] * * * compels the United States to *deliver* water on conditions imposed by the State"—a concession required by Ivanhoe Irr. Dist. v. McCracken, 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1958). See also State of Arizona v. State of California, 373 U.S. 546, 585–588, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963). They contend, however, that the language used by the Court in *Ivanhoe* indicates that the government is required to comply with state law in *acquiring* water rights.[22] Appellants suggest no reason for the distinction they urge. In any

21. "The senate report also incorporated correspondence between Senators Magnuson and McCarran. The former was disturbed by the thought that private water disputes could, under the bill, interfere with reclamation projects in which he was interested. Senator McCarran wrote (S. Rep.No.755, 82d Congress, 1st Session 9 (1951):

'You indicate that you visualize the possibility of an individual or group, having water rights on that stream, bringing suit to adjudicate their respective rights thereby preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending.

'S. 18 is not intended to be used * * * for any other purpose than to allow the United States to be joined in a suit wherein it is necessary to adjudicate all of the rights of various owners on a given stream.'"

State of Cal. v. Rank, 293 F.2d 340, 347 (9th Cir. 1961). See also Dugan v. Rank, 372 U.S. 609, 617–618, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

The Senate report comments upon the exchange of correspondence as follows (S. Rep.No.755, 82d Cong., 1st sess., p. 6):

"Senator Magnuson raised the question as to whether S. 18 could be used for the purpose of delaying or blocking a multiple-purpose development such as proposed for the Hells Canyon project on the Snake River in the Columbia Basin or other similar projects, stating that there was a possibility of an individual or group having water rights on that stream bringing suits to adjudicate their respective rights and therefore preventing the Bureau of Reclamation from going ahead with the Hells Canyon project while litigation is in process or pending. The committee, for the legislative history of this bill, definitely desires to repudiate any such intent which may be deduced from S. 18 and states that this is not the purpose and the intent of this legislation. Where reclamation projects have been authorized for the benefit of the water users and the public generally, they should proceed under the law as it exists at the present time and should the Government have reason to need the water of any particular user on a stream, that water should be obtained by condemnation proceeding as is already provided for by law."

22. "As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it *to acquire* water rights or vested interests therein. But the acquisition of water rights must not

event, if there was doubt it is dispelled by the Court's statement in City of Fresno v. State of California, 372 U.S. 627, 630, 83 S.Ct. 996, 998, 10 L.Ed.2d 28 (1963), that *Ivanhoe* settled the proposition that section 8 of the Reclamation Act of 1902 "does not mean that state law may operate to prevent the United States from exercising the power of eminent domain to acquire the water rights of others."

We must agree with the government that "reason precludes an interpretation of the general provisions of Section 8 of the Reclamation Act [of 1902] and Sections 1 and 8 of the Flood Control Act [of 1944] which would impute to Congress an intention to frustrate its plans for this project by subjecting it to the risk that it might never be used for some of the authorized purposes, should a state permit not be forthcoming." Compare Anderson v. Seeman, 252 F.2d 321, 324 (5th Cir. 1958).

*Third.* Appellants' third contention is that appellee officials acted unlawfully in delivering water from Pine Flat project before contracts were executed with recipients of the water providing for repayment of construction costs and for sale of lands in excess of 160 acres owned by a single recipient, as required by section 46 of the Omnibus Adjustment Act of 1926, 44 Stat. 649, 43 U.S.

C.A. § 423e, and section 5 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S. C.A. § 431. Assuming that these statutes imposed the limitation upon the authority of appellee officials which appellants suggest and that appellee officials failed to comply, appellants cannot assert a right in themselves to injunctive relief on this ground. The injury which appellants claim was not caused by a violation of this limitation. The officials might have complied fully with the statutes, yet continued to store and release water from Pine Flat reservoir exactly as appellants allege they did, and with precisely the same injury to appellants' water rights. Moreover, the statutes imposed a duty upon the Secretary of Interior in the interest of the public at large, and there is nothing in the statutes to indicate that Congress intended to confer a litigable right upon private persons claiming injury from the Secretary's failure to discharge his duty to the public. Compare Perkins v. Lukens Steel Co., 310 U.S. 113, 125–127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). See generally, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 150–153, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Justice Frankfurter concurring).[23]

*Fourth.* Finally, appellants challenge the contractual arrangements for the operation of Pine Flat dam between

be confused with the operation of federal projects. As the Court said in State of Nebraska v. State of Wyoming, supra, 325 U.S. at page 615 [65 S.Ct. 1332, 89 L.Ed. 1815]: 'We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system.' Section 5 is a specific and mandatory prerequisite laid down by the Congress as binding in the operation of reclamation projects, providing that '[n]o right to the use of water * * * shall be sold for a tract exceeding one hundred and sixty acres to any one landowner * * *.' We read nothing in § 8 that compels the United States *to deliver* water on conditions imposed by the State. To read § 8 to the contrary would require the Secretary to violate § 5, the provisions of which, as we shall see, have been

national policy for over half a century." (Emphasis added.) Ivanhoe Irr. Dist. v. McCracken, 357 U.S. 275, 291–292, 78 S.Ct. 1174, 1183–1184 (1958).

23. Appellants argue that in any event violation of the statutory limitation here referred to precludes application of the doctrine of inverse condemnation because the taking of appellants' water rights for the use of others without complying with this statutory limitation would be a taking for private rather than for public use, an objection which any taxpayer (citing Mid-America Pipeline Co. v. Iowa State Commerce Commission, 253 Iowa 1143, 114 N.W.2d 622, 625 (1962)), and certainly the property owner, has standing to raise. We fail to see how non-compliance with the statutory acreage limitations would render the use for which appellants' water rights were taken any the less a public use.

appellee officials and local irrigation interests. See note 2. They recognize that the execution of such a contract was contemplated by H.R. Doc. No. 630—the Corps of Engineers report. However, they point to the language of section 10 of the Flood Control Act of 1944, 58 Stat. 901, which authorizes construction in accordance with the plans contained in H.R. Doc. No. 630, "Provided, That the conditions of local cooperation specified in said document shall not apply." [24] Passing appellants' standing to raise the issue, it seems clear that they misread the proviso. A reading of H.R. Doc. No. 630, 78th Cong., 3d sess., p. 5, indicates that "the conditions of local cooperation," which were not to apply, related to obtaining assurances from state or local agencies for initial financing of the project and for maintenance and operation of the facility after completion as a condition precedent to the commencement of construction. The two subsequent provisos confirm the conclusion that this was the subject Congress had in mind. See 41 Op.A.G. 377, 382 (1958). It would be surprising indeed if Congress meant to bar use of the type of contractual arrangement involved here. Contracts of this type are expressly authorized by the Federal Reclamation laws,[25] and are common. Maass, 38 Calif.L.Rev. 666, 671 (1950).

Appellants argue that in any event their second cause of action (and the third cause of action pendent to it)

should not have been dismissed as to the defendants other than appellee officials. We are satisfied that there was no basis for federal jurisdiction of appellants' second cause of action which did not require the presence of the United States: diversity of citizenship was lacking; and the interests of the United States were inextricably involved in all of appellants' claims arising under federal statutes. Compare State of Arizona v. State of California, 298 U.S. 558, 571, 56 S.Ct. 848, 80 L.Ed. 1331 (1936).

Affirmed.

---

24. The relevant portion of § 10 reads as follows:
    "The project for flood control and other purposes for the Kings River and Tulare Lake Basin, California, is hereby authorized substantially in accordance with the plans contained in House Document Numbered 630, Seventy-sixth Congress, third session, with such modifications thereof as in the discretion of the Secretary of War and the Chief of Engineers may be advisable at an estimated cost of $19,700,000: *Provided, That the conditions of local cooperation specified in said document shall not apply: Provided further,* That the Secretary of War shall make arrangements for payment to the United States by the State or other responsible agency, either in lump sum or an-

nual installments, for conservation storage when used: *Provided further,* That the division of costs between flood control, and irrigation and other water uses shall be determined by the Secretary of War on the basis of continuing studies by the Bureau of Reclamation, the War Department, and the local organizations." (emphasis added.)

25. 38 Stat. 687, 43 U.S.C.A. § 499 provides:
    "Whenever any legally organized water-users' association or irrigation district shall so request, the Secretary of the Interior is authorized, in his discretion, to transfer to such water-users' association or irrigation district the care, operation, and maintenance of all or any part of the project works, subject to such rules and regulations as he may prescribe."